FIRST DIVISION
June 19, 2006

No.1-03-3130

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | No. 02 CR 3236 |
| | ) | |
| JOHN SULLIVAN, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE CAHILL delivered the opinion of the court:

Defendant John Sullivan was convicted after a jury trial of the first degree murder of Charlie Hill and sentenced to 22 years in prison. He appeals, claiming he was denied a fair trial because 1 the trial court allowed inadmissible hearsay statements 2 the trial court allowed inadmissible gang evidence 3 the State committed prosecutorial misconduct and 4 the State failed to prove him guilty beyond a reasonable doubt. We affirm.

The victim was shot and killed on the night of April 14, 2001, near a housing complex known as the Manor at 18th Street and Kildare Avenue. The victim was the leader of the K-Town faction of the Gangster Disciples K-Town GDs street gang. Defendant, the alleged leader of the rival Manor faction of the Gangster Disciples Manor GDs , was arrested nine months later. On February 8, 2002, defendant was charged with first degree murder. Larell Williams and Brandon Ayres, also

Manor GDs, were charged but tried separately.

Many of the parties here were known by one or more nicknames. We use only those nicknames attributed to defendant John, Big John, Jigga, Jigger, Jiggler and Jay. All other parties are identified by their surnames. The parties and their gang affiliations were Manor GDs - defendant, Williams and Ayres K-Town GDs - Michael Solomon, Frank Brown, Decorey Stamps and the victim. Solomon was murdered before the trial began.

Two pretrial hearings were held. In the first, the trial judge allowed an out-of-court, inculpatory statement by Solomon, an alleged witness to the murder, under the excited utterance exception to the hearsay rule. The judge deemed inadmissible Solomon's grand jury testimony that implicated defendant. In a second pretrial hearing before a different judge, the State moved to establish that defendant and the victim were street gang members through the testimony of a police officer who knew defendant. The judge ruled that the officer could testify that there were two rival gang factions and that defendant was a member of one of those factions.

Defendant's jury trial began on April 15, 2003. The State called Stamps. Stamps testified he was a member of the K-Town GDs. He identified defendant in court as someone he had seen at the Manor. Stamps said he had seen defendant plenty of times before the shooting and both were members of the GDs. Stamps testified that on the night of the shooting the victim decided to go to the Manor because the GDs there were having a meeting about the K-Town GDs. The victim wanted to know what was being said. Stamps drove the victim to the Manor. Solomon and Brown rode in the backseat. Stamps said he parked beside Dumpsters. The Dumpsters did not block Stamps view of the buildings. The victim got out of the car. Stamps saw Williams, a Manor GD, wave for the victim to come toward

2

him. Stamps said he then saw the man he recognized as John emerge from the side of a building. He identified John as defendant. Stamps said he saw John shooting at the victim. Stamps then saw Ayres, whom he knew to be a gang member from defendant s territory, come out of the Manor. Ayres also shot at the victim. Defendant then started shooting at the victim again. After that, the gunfire stopped and Stamps could no longer see the victim. Stamps said he, Solomon and Brown were seated inside Stamps car during the shooting. Stamps then drove around the block to intercept the victim if he was running away. He stopped the car and sent Solomon to look inside the Manor where Solomon reported he saw the victim on the ground.

Stamps said he viewed a lineup on April 17, 2001, where he identified Williams. He identified Ayres in a lineup on July 2, 2001, as one of the men who shot at the victim. Stamps testified that on January 21, 2002, he identified defendant in a lineup and in a photo array. Stamps testified that other people said defendant held a rank in a street gang. Defense counsel objected to the testimony as hearsay and the trial court sustained the objection. Stamps admitted he was on probation for a narcotics offense and had another narcotics case pending.

Stamps admitted on cross-examination that his cousin was arrested at Stamps' house for the murder of Solomon. Stamps also admitted he had been a marijuana smoker for six to seven years. Stamps said the victim s son was his best friend. Stamps testified that he and his friends had been waiting for a barbeque to begin before Stamps drove the victim to the Manor. Stamps said that although it was dark outside at 8 50 p.m. on the night of the shooting and he was 30 to 35 feet away from Williams, he could see Williams waving his hand and the other people who were present because there were lights in the hallway of the Manor. After Williams waved, Stamps saw defendant walk forward. Stamps said he

3

knew defendant's name at the time of the shooting. He said the shooters were about 25 feet from the victim and he saw defendant shooting toward the victim. He said he saw defendant after he heard the gunshots and defendant was holding a silver-colored revolver. Stamps admitted he did not see defendant fire the gun, but he heard defendant fire four or five shots in rapid succession. He said, I just saw defendant when he posed up and started shooting, pow, pow. Stamps admitted he could not tell whether defendant s bullets hit the victim. Stamps said he did not see the victim get wounded and he expected the victim to return to the car. Stamps said he spoke to Pellegrini that night and told the police that John, whose nickname was Jigger, did the shooting. Stamps said he did not then know defendant s last name.

Stamps testified on redirect that he identified Williams, whom he knew to be defendant s friend, on the night of the shooting. Stamps said he knew defendant only as John or Jigger that night. Stamps testified that his cousin confessed to the murder of Solomon and that crime had nothing to do with the victim s murder.

The State called Frank Brown. Brown testified he grew up with the victim and knew him to be a leader of the K-Town GDs. Brown made an in-court identification of defendant. He said that in 2001 he knew defendant only as Big John. Brown said that he, Stamps, Solomon and the victim were GDs. Brown said that the four of them rode together to the Manor. Stamps parked the car behind some Dumpsters in a way that they had a view of the Manor. The victim exited the car. Brown said he saw a guy waving his hand, and I saw John and Ayres start shooting. Brown said he wore glasses at that time and he obtained new glasses one week later because his eyes had gotten a little bad. This testimony followed

MS. KAZAGLIS Assistant State s Attorney

Q. When you said you saw guys come out shooting were you able to tell who they were?

A. Not at the time, no.

Q. Did you ask anyone in the car ---

A. I asked Solomon and Stamps who is that.

MS. ROTUNNO defense counsel Objection.

THE COURT Overruled.

BY MS. KAZAGLIS

Q. What - - who did Solomon tell you the shooters were?

A. Jigga.

MS. ROTUNNO Objection, hearsay.

THE COURT Overruled.

BY MS. KAZAGLIS

Q. He said Jigga and Ayres?

A. Yes.

Q. What did you say then?

A. I said who is Jigga.

Q. What did Solomon say?

A. Big John.

Q. When he said Big John, did you know who he meant?

A. Yes, I did.

Q. Did you know him to mean the defendant Big John?

A. Yes.

Q. When you saw the guy shooting, were you able to see any part of the victim?

A. Just his hat.

Q. What did you see happen?

A. After the shooting, I seen the hat jump off his head.

Q. That was after you saw two people shooting and Solomon told you it was Ayres and Big John, right?

A. Correct.

MS. ROTUNNO Judge, I'm going to object to Counsel restating the testimony.

THE COURT Overruled. Ask another question. Try not to lead the witness.

Brown further testified that on July 2, 2001, he identified Ayres in a lineup and on January 21, 2002, he identified defendant in a lineup.

On cross-examination, Brown admitted to being a gang member for about 10 years and that he was still a member. Brown testified that on the night of the shooting, Stamps did not mention a barbecue. Brown said after the victim exited the car, he saw the victim walk about 90 feet when Brown lost sight of

him behind the Dumpsters. Brown said that one shooter wore a white hat and the other wore a black hat. When he heard gunfire he could see figures of people and asked who was shooting. Solomon said Jigga. Brown said who the hell is Jigga because he knew defendant only as John. He lost sight of the victim from the moment he saw the victim's hat jump off his head. Brown said on the night of the shooting, he gave the police the first names of the people responsible, including the name John. He told the police he saw the figures of people and sparks when shots were fired. He said the shooters came out one by one, with the first firing three shots, the second firing three shots, and then the first firing again. He said it could be possible that another person was shooting as well. He admitted he identified defendant based on what Solomon told him.

Detective John Pellegrini testified that Stamps and Brown viewed a lineup on July 2, 2001, and both identified Williams and Ayers. Pelligrini testified that during his investigation on July 2, 2001, he ascertained a full name to go with Jigga and the name was John Sullivan. Pelligrini then compiled a photo array from which Stamps chose defendant's photo as the man he knew as "Jigga" or "John." On January 21, 2002, Brown viewed a lineup and picked out defendant as one of the men who shot at the victim.

On cross-examination, Pelligrini admitted that the shooting took place on April 15, 2001, but the lineup for defendant did not take place until January 2002, nine months after the shooting. He testified that the first time I even knew defendant's identification was back in July during the investigation with Mr. Ayres. Defense counsel then asked if Pellegrini found out that Jigga was linked to the name John Sullivan by a name check in the computer. Pellegrini answered no." The State objected. The court held a sidebar outside the presence of the jury and the court reporter. When the proceedings resumed, defense counsel withdrew the last question.

7

On redirect examination, the State asked Pellegrini if he had a conversation with Ayers on July 2, 2002. Pelligrini answered yes and the State asked what Ayres had said. Defense counsel objected and another sidebar conference was held

"THE COURT    The Defense asked this witness how they got the name John Sullivan, how the defendant got involved and implicated in this case and asked if his name came out of a computer matching Jigga to John. The answer was no. The State now says that opens the door to how he got implicated in this case, and it came from the co-defendant Brandon Ayers.

MS. KAZAGLIS   Yes.

THE COURT   What do you expect his answer to be to this question?

MR. SHEPPARD Assistant State s Attorney    In response to the questions, he admitted his involvement.      Ayres said he was with Jigga. Pelligrini asked who that was.     Ayres said that was John Sullivan.

THE COURT   I understand the Defense would be objecting to this on the grounds of hearsay. It s not subject to cross-examination because     Ayres is indicted for murder in this case and obviously has Fifth Amendment rights that we cannot impose upon at this trial. I know that the door has been opened up, but not nearly to the extent that you re going to.

So what you will be limited to inquiring is simply that John Sullivan, his name came up from    Ayres , period , without any details as to what    Ayres said. That part

8

has been opened, but no more because it's highly prejudicial. It's probative, but the Defense did open the door, but they opened it a little bit.

Defense counsel objected. The court overruled the objection. Pelligrini then testified that he learned the name John Sullivan from his conversation on July 2, 2001, with Ayres.

Officer Robert W. Hartmann testified that he investigated the shooting that night. He said he learned that Williams, Ayres and a third person, known as "Jay," "John" or "Jigga," were the shooters. He testified that after lineups were held on July 2, 2001, he learned that the person known as "John," "Jay" and "Jigga" was defendant. He made an in-court identification of defendant. Hartmann said he was present at a lineup on January 21, 2002, when Stamps identified defendant as one of the men he saw firing a gun at the victim.

On cross-examination Hartmann admitted that no one identified the man with the nicknames "John," "Jay" and "Jigga" as John Sullivan before July 2, 2001. On redirect, he testified that Stamps and Solomon told him that the man known as "Jay," "Jigga" or "John" was the head of the Manor GDs.

The State presented evidence by stipulation that Investigator Sullivan, if called to testify, would describe a gun, cartridges, cartridge cases, fired bullets and metal fragments found at the scene of the shooting. Investigator Pater would testify that he recovered a bullet envelope from the medical examiner's office.

Officer John Tanaka testified that he was familiar with gang activity and that the Manor was his beat. He said the victim was the leader of a rival gang faction and Stamps and Solomon were members of that gang. Tanaka said he had met the defendant three years earlier and defendant had said he was a member of the GDs. Tanaka said that after he noticed defendant's presence at the Manor, aspects of the gang's

leadership began to change. Tanaka arrested defendant on January 20, 2002, for the murder of the victim. He said defendant gave him the nicknames "Jigga" and "Jay."

On cross-examination, Tanaka admitted that he was not a gang specialist and that the State's Attorney had "prepped" him for his testimony. He said he assumed defendant had some leadership quality within the gang.

The defense called Steven Wham Cari, an attorney employed by defense counsel. Cari testified that he spoke with Solomon on September 24, 2002, one day before Solomon was killed. Cari testified that he received a phone call from someone who said that Solomon wanted to speak to him. Cari and other attorneys representing defendant met with Solomon. Solomon told them that he had not told the truth to the grand jury when he said he saw the shooting. Cari said Solomon told him he "ducked down" when shots were fired and he never saw what happened.

The State then called Assistant State's Attorney Peter Karlovics to rebut Cari's testimony. Karlovics was an assistant State's Attorney on April 25, 2001, working on the homicide grand jury unit. He met with Solomon immediately before Solomon's grand jury appearance. Solomon told Karlovics that he had witnessed the victim's murder. Solomon identified three people as those responsible for the murder. He identified photos of Williams and Ayers and gave the name "Jiggler." Then Solomon testified before the grand jury and, in Karlovic's presence and under oath, identified Williams' photo and said Williams was one of the shooters. Solomon said Ayers was a shooter and gave the name "Jiggler" as the other shooter. Karlovics admitted on cross-examination that Solomon never identified a photograph of defendant.

The prosecutor said in closing argument "on July 2, 2001, after Brandon Ayres is identified in

that lineup as being the second person to shoot, we learn that Jigga, John, Jay, whatever he wants to call himself, is John Sullivan.

Defense counsel in closing said that Stamps, Brown and Solomon lived in the  cesspool of gang life.

The prosecutor in rebuttal argued

MS. KAZAGLIS        The cesspool of gang life is what we re talking about.        I tell you  defendant  is the lifeguard of it.

You heard a lot about reasonable doubt, and that s  the State s  burden, and we welcome it       because jails throughout the United States are filled with people convicted of crimes, convicted of murder – –

MR. GOLDBERG   Objection     .

THE COURT  Overruled.

MS. KAZAGLIS   – – beyond a reasonable doubt.  It happens all the time. It happens every day.

MR. GOLDBERG  Objection     . That s a fact not in evidence.

THE COURT        Respectfully overruled. She can argue her inference, but let s get to this case now.

MS. KAZAGLIS   You know that crimes go unsolved every day because

11

people are living in an area that they are fearful of.

MR. GOLDBERG   Objection  . There is no evidence of that.

THE COURT       Overruled.

MS. KAZAGLIS   Do you really think that these people are going to say, yes, I saw defendant commit a murder? I saw the leader of the Gangster Disciples commit murder? Or do you think   if there were any other people they have been so fearful and are so fearful that they are afraid to come forward.

MR. GOLDBERG   Objection for the record   .

THE COURT   That objection will be sustained. The jury will disregard the last comment.


Ms. Kazaglis       Frank Brown     is not holding himself up to be an eyewitness. He is not saying he is an eyewitness. He just told you what Solomon  said. As soon as Brown  heard the shooting, Solomon  said it s Williams , it s Ayres , and it s Jigga  and Brown  said who is Jigga? And then     Solomon said, John  and  Brown  told you, I know who Big John is. We are not putting     Brown up here to tell you he was an eyewitness to the murder.    He s just telling you what he heard.

And you also heard the testimony of Stamps     .     It s not just Stamps . It s not just what Michael Solomon told you. You have the physical evidence.


You know what     Solomon said both from what he said to     Brown and what

Karlovics told you Solomon said in front of the grand jury sworn under oath and told you who the third guy was. That s the believable evidence that you heard.

To say it took a long time to get the defendant, do you really think that defendant here, during the time that he knew he had committed a murder sat at The Manor and said , police, woo hoo, here I am. Come and get me. Or do you think he did what people in the gang – what sneaky people do. He hid out .

After Ayres is identified in a lineup, you heard what happened through the course of the police investigation. You heard that they learned when they were talking with Ayres the name of John Sullivan.

The jury found the defendant guilty of first degree murder. Defendant filed a motion for a new trial. His arguments in his amended motion for a new trial included a claim that Solomon s out–of–court posthumous testimony should have been barred as hearsay. He also claimed that the prosecutor committed reversible error in closing argument by saying that jails are filled with people convicted of murder. The trial court denied the motion and sentenced defendant to 22 years in prison.

Defendant appeals. He presents some 25 points of error that he claims either individually or collectively warrant outright reversal or remand for a new trial. The resolution of most of the issues depends on two findings 1 whether Brown's testimony that Solomon said defendant was a shooter was admissible evidence and 2 whether the evidence was sufficient to prove defendant guilty beyond reasonable doubt and, if so, whether it was closely balanced.

We begin with the question of whether the trial court erred in admitting under the spontaneous

declaration exception Brown's testimony that Solomon identified defendant. We review the evidentiary rulings of a trial court deferentially and reverse only if the trial court abused its discretion, resulting in manifest prejudice to the accused. *People v. Tolliver*, 347 Ill. App. 3d 203, 222, 807 N.E.2d 524 (2004). An abuse of discretion exists where the trial court's ruling is arbitrary, fanciful or unreasonable or where no reasonable person would take the view adopted by the court. *People v. Illgen*, 145 Ill. 2d 353, 364, 583 N.E.2d 515 (1991).

Defendant claims that Brown's testimony that Solomon identified defendant immediately after the shooting was inadmissible hearsay. He argues that Solomon gave a self-interested reply to Brown's question, "who is that?" to further the rivalry between the GD factions by implicating defendant as the shooter of the rival K-Town GDs leader. The State argues that the statement was properly admitted under the spontaneous declaration or exited utterance exception to the hearsay rule.

Hearsay evidence, an out-of-court statement offered to prove the truth of the matter asserted, is generally inadmissible unless an exception applies. *People v. Yancy*, No. 1-04-2605, slip op. at 5 (December 29, 2005). The problem with hearsay evidence is that the defendant has no opportunity to cross-examine the declarant. *Yancy*, slip op. at 5. Inadmissible hearsay exists where, as here, a third party testifies to statements made to him by another nontestifying party that identify the accused as the perpetrator of a crime. *Yancy*, slip op. at 5. A recognized exception in hearsay jurisprudence is the spontaneous declaration or excited utterance. *People v. Williams*, 193 Ill. 2d 306, 352, 739 N.E.2d 455 (2000). The rationale behind the rule is

'The admissibility of such exclamation is based on our experience that, under certain external circumstances of physical or mental shock, a stress of nervous excitement may be

14

produced in a spectator which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, rather than reason and reflection, and during the brief period when consideration of self-interest could not have been fully brought to bear, the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him. People v. Damen, 28 Ill. 2d 464, 471, 193 N.E.2d 25 1963 , quoting Keefe v. State, 50 Ariz. 293, 72 P.2d 425 1937 .

A statement admitted under this exception must be 1 after an event that is startling enough to produce a spontaneous and unreflecting statement 2 without time to fabricate and 3 related to the circumstances of the occurrence. Williams, 193 Ill. 2d at 352. Whether a declarant's statement is admissible as a spontaneous declaration depends on the totality of the circumstances. People v. Georgakapoulos, 303 Ill. App. 3d 1001, 1012, 708 N.E.2d 1196 1999 . To determine if the statement was spontaneous, excited and unreflecting, courts consider the time elapsed between the event and the utterance, the nature of the event, the declarant's mental and physical condition and the presence of self-interest. Georgakapoulos, 303 Ill. App. 3d at 1012. The fact that a statement was made in response to a question can affect whether the statement qualifies as an excited utterance. Williams, 193 Ill. 2d at 353. A statement made in response to a question does not "automatically negate" its spontaneity but is merely one factor to be considered in the totality of circumstances. Georgakapoulos, 303 Ill. App. 3d at 1014. Whether a statement is admissible as a

15

spontaneous declaration is within the trial court's purview and its decision will not be overturned absent an abuse of discretion. *Georgakapoulos*, 303 Ill. App. 3d at 1012.

In *Georgakapoulos*, the defendant argued that the victim's identification of the shooter did not qualify as an excited utterance because it arose from a dispute between rival gangs and it was in the declarant's self-interest to blame the rival gang. *Georgakapoulos*, 303 Ill. App. 3d at 1013. The court rejected that argument and found that the victim's statements were made under conditions which would foreclose an opportunity to fabricate. *Georgakapoulos*, 303 Ill. App. 3d at 1013. The statements were made almost immediately after a shooting and related to a startling event, the shooting. *Georgakapoulos*, 303 Ill. App. 3d at 1013. The victim was repeatedly questioned by the police at the time he made the statement. But the court concluded that even statements in response to questions can be considered an excited utterance under certain circumstances. *Georgakapoulos*, 303 Ill. App. 3d at 1014. A declarant's response to questions such as "what happened" and "who shot you" does not destroy its spontaneity. *Georgakapoulos*, 303 Ill. App. 3d at 1014. "In determining admissibility, the trial court should consider such factors as whether the statements would have been made if the questions had not been asked and whether the totality of the circumstances indicate that the declarant was still under the shock of the event when the statements were made. *Georgakapoulos*, 303 Ill. App. 3d at 1014. Although *Georgakapoulos* differs from this case in that the declarant there was the victim, we extend the same reasoning to the circumstances of this case and conclude that Brown's testimony about Solomon's statement was properly admitted.

We have not found, nor apparently have the parties found, an Illinois case where, as here, the disputed utterance was made by a witness who was not the victim. The State filed a motion to cite additional

16

authority after oral arguments, citing an unpublished Tennessee case, <u>State v. White</u>, No. W2003-02558-CCA-R3-CD Tenn. App. March 30, 2003 . Defendant contested the motion, arguing that a Tennessee case is not binding in Illinois and <u>White</u> is factually distinguishable. We granted the motion. Under Tennessee Court of Criminal Appeals Rule 19 Tenn. Crim. App. R. 19 , an unpublished case may be cited as long as the proponent furnishes a copy of the opinion to the court and opposing counsel. That was done here. But as defendant argues and the State concedes, the findings of the courts of other states are not binding here. See <u>Mount Vernon Fire Insurance Co. v. Heaven's Little Hands Day Care</u>, 343 Ill. App. 3d 309, 320, 795 N.e.2d 1034 2003 . Nor do we find it necessary to turn to another state for guidance on this issue.

Instead, we conclude that Solomon's statement to Brown qualifies as a spontaneous declaration under existing Illinois law as stated in <u>Georgakapoulos</u> and the cases it cites. We have not encountered in our research a rationale for why a victim s spontaneous declaration should be considered as an exception to the hearsay rule, but the same statement in the mouth of an eyewitness should be excluded.

Here, Solomon saw a person who was well known to him, the leader of his street gang, shot to death by repeated gunfire at a distance of 30 feet. The facts support the conclusion that the victim did not expect to be shot. While it can be argued that shootings are always a possibility in street gang encounters, the evidence shows that the victim's behavior in exiting the car and walking alone toward the Manor showed he did not expect to encounter gunfire. It can be inferred that Solomon, Brown and Stamps also were unprepared for the events as they unfolded. The time between the shooting and Solomon s statement to Brown was no more than seconds. Brown used the present tense, "who is that." Emphasis added. We

do not believe that Solomon would have had the time or presence of mind under the circumstances to fabricate his statement. The record is silent on Solomon's mental and physical state, but that silence does not show that he was cool and calculating. Defendant s argument that Solomon identified defendant for reasons of self-interest and gang rivalry is speculation. There would appear to be no point in arousing Brown s sense of rivalry when he, like Solomon, was aligned with the K-Town GDs. Nor do we believe that the fact that Solomon responded to a question negates the declaration's spontaneity. Brown asked two questions—who is the shooter and who is Jigga. These two brief questions and answers in the context of the circumstances do not prevent Solomon s identification from qualifying as a spontaneous declaration. The totality of the circumstances here supports the trial court s decision to admit the evidence. The trial court did not abuse its discretion in admitting Brown's testimony.

We next consider whether the evidence, including the testimony of Brown, was sufficient for the jury to find defendant guilty beyond a reasonable doubt. Defendant argues that the State s case was weak. He contends that Stamps' testimony was the lynchpin of the State's case and his identification testimony was not credible. Defendant argues specifically that Stamps could not have seen the shooter from his vantage point because his view was obstructed by a Dumpster, it was dark, the shooter was too far away, the shooter was wearing a hat and Stamps probably ducked when he heard the gunshots. Defendant also argues that Stamps identification of defendant was suspect because Stamps did not identify defendant until nine months after the shooting  he was motivated to implicate defendant falsely by his friendship with the victim s son, gang rivalry and a pending drug charge  his testimony conflicted with other, more reliable evidence  and his testimony was internally inconsistent. Defendant argues that these combined factors raise a reasonable doubt as to defendant's guilt.

18

The State contends that Stamp's credibility and the weight of his testimony were questions for the jury and it had ample evidence to conclude that Stamps could have seen and identified defendant as a shooter.

The function of a reviewing court is to decide whether, after considering the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. People v. Smith, 185 Ill. 2d 532, 541, 708 N.e.2d 365 1999 . A reviewing court will not retry the defendant. Smith, 185 Ill. 2d at 541. We must give due consideration to the fact that the court and jury saw and heard the witnesses. Smith, 185 Ill. 2d at 541. The trier of fact is free to resolve inconsistencies in testimony and is free to accept or reject as much or as little of a witness's testimony as it pleases. People v. Logan, 352 Ill. App. 3d 73, 80-81, 815 N.e.2d 830 2004 . We will reverse a conviction only where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant s guilt. Smith, 185 Ill. 2d at 542. The presence of motive to lie does not render testimony unconvincing. People v. Hudson, 198 Ill. App. 3d 915, 923, 556 N.e.2d 640 1990 .

An eyewitness identification of the accused by even a single witness, unless it is vague or doubtful, will sustain a conviction if the witness viewed the accused under circumstances that would allow a positive identification. People v. Lewis, 165 Ill. 2d 305, 356, 651 N.e.2d 72 1995 . A court must determine if the identification is reliable under the totality of the circumstances, including  1  the witness s opportunity to view the accused at the time of the offense   2  the witness s degree of attention  3  the accuracy of the witness s earlier description of the person   4  the witness s level of certainty at the time the witness confronts the person  and  5  the length of time between the crime and identification confrontation. Lewis, 165 Ill. 2d at 356.

19

Here, Stamps testified that he had seen defendant "plenty of times" before the night of the shooting and could have recognized him easily. Stamps and defendant were members of the same GDs street gang, albeit rival factions. Stamps claim that he had seen defendant before was not unreasonable. Stamps specifically testified that his view was not obstructed by the Dumpsters at the scene. Brown s testimony corroborated the claim that the view was not blocked by the Dumpsters. The jury heard that Stamps was about 30 to 35 feet away from the victim and the area from which the shooters emerged was well illuminated by lights from the hallway of the building. Stamps admitted that defendant wore a hat that night but testified that most of his face was visible. He had seen defendant wearing the same hat before. Stamps expressed no doubt that John, also known as Jigger, was one of the shooters. Stamps told the police on the night of the murder that John, also known as Jigger, was the shooter. We do not believe that the fact that the police were unable to show Stamps a photo array or lineup until nine months later negates the reliability of Stamps positive identification of defendant by his nickname on the night of the shooting.

Stamps compelling testimony that defendant shot at the victim was corroborated by Brown's testimony of being told by Solomon that defendant was one of the shooters. Brown s testimony showed that Solomon's statements were immediate and certain responses to the question, "who is that?" Brown said he was a long-term gang member, had seen defendant in the past and knew defendant to be at the Manor. His testimony corroborated Stamps that one of the figures who was shooting wore a white hat. The physical evidence of cartridges, cases, fired bullets and metal fragments comported with the testimony of Stamps and Brown that there were multiple gunshots.

The defense offered little resistence to the State s burden of proof beyond a reasonable doubt. Their only evidence was the testimony of Carl, one of defendant's lawyers. Solomon's alleged statement to

Cari that said he lied to the grand jury about defendant being a shooter served to exonerate defendant. It would no doubt have been in Solomon's best interests to have defendant believe that Solomon had not implicated him in the murder. Assuming the truth of Cari's testimony, Solomon's claim is not persuasive under these circumstances.

We have considered the evidence in the light most favorable to the State and conclude that rational jurors could have found beyond a reasonable doubt that defendant committed the murder. The evidence, including Stamps' eyewitness testimony, was strong enough to be regarded as overwhelming.

Defendant claims his constitutional right to be confronted by the witnesses against him were violated with the admission of hearsay evidence other than Brown s testimony 1 Karlovic s testimony that Solomon identified defendant to the grand jury and told him that defendant was responsible for the murder 2 Pellegrini s testimony that he learned the name of defendant on July 2, 2001, after speaking with Ayres and 3 Stamps and Solomon's statements to Hartmann that defendant was the leader of a gang faction.

Defendant s authority is Crawford v. Washington, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 203, 24 S. Ct. 1354, 1374 2004 . Crawford interprets the confrontation clause of the sixth amendment to the United States Constitution. The clause guarantees defendants in criminal prosecutions the right to be confronted with the witnesses against them. U.S. Const., amend. VI. The Supreme Court in Crawford interpreted the clause to mean that an unavailable witness s testimonial hearsay statement is admissible only if the defendant had an opportunity to cross-examine the declarant. The State maintains that the evidence defendant complains of was not barred by the confrontation clause or Crawford because defendant invited the evidence by offering Cari's testimony about Solomon or opened the door to its

1-03-3130

introduction on cross-examination of the State's witnesses. The State argues that *Crawford* does not prevent it from introducing evidence to rebut allegations first raised by defendant. Alternatively, the State claims defendant waived his complaint about Hartmann s testimony by failing to object at trial. *People v. Enoch*, 122 Ill. 2d 176, 188, 522 N.E.2d 1124 1988 .

In *Crawford*, the Supreme Court determined that the testimonial hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had an earlier opportunity for cross-examination. *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 24 S. Ct. at 1374. The term testimonial means, at a minimum, earlier testimony at a preliminary hearing, before a grand jury, at a former trial or in a police interrogation. *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374 *People v. Patterson*, 217 Ill. 2d 407, 423, 841 N.E.2d 889 2005 .

Neither the parties nor this court has found an Illinois case that addresses the precise question here does the confrontation clause as interpreted in *Crawford* bar the testimonial statement of an unavailable witness where those statements serve to rebut testimony offered by the defense in its case in chief or elicited by the defendant when cross-examining a State witness? The State calls our attention to federal and out-of-state cases supporting its request for an Illinois opinion that testimony to rebut evidence elicited by a defendant is not barred under *Crawford*. The State cites *United States v. Hite*, 364 F.3d 874, 883 n.12 7th Cir. 2004 certiorari granted and judgment vacated in *Hite v. United States*, 543 U.S. 1103, 160 L. Ed. 2d 1012, 125 S. Ct. 1027 2005 for remand limited to sentencing where a witness is not truly available and where the hearsay statements at issue were offered by the defendant and not the prosecution, the sixth amendment was not implicated *Commonwealth v.*

*Gonzalez*, 443 Mass. 799, 803 n.8, 824 N.E.2d 843, 849 n.8 2005 the court declined to reach the *Crawford* issue where the defense introduced a testifying defense witness s grand jury testimony as substantive evidence and *Le v. State*, 2002-DP-01855-SCT Miss. 2005 the State is permitted to introduce rebuttal evidence that would ordinarily be prohibited under *Crawford* where the defendant offered the hearsay statements in his case in chief .

We find it unnecessary to reach the decision sought by the State. Instead, we conclude that the admission of the evidence complained of was, at most, harmless error. Our supreme court in *Patterson* determined that confrontation clause violations under *Crawford* are subject to a harmless error analysis. The court in *Patterson* recognized three different approaches for measuring error under this harmless-constitutional-error test 1 focusing on the error to determine whether it might have contributed to the conviction, 2 examining the other evidence in the case to see if overwhelming evidence supports the conviction, and 3 determining whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *Patterson*, 217 Ill. 2d at 428, citing *People v. Wilkerson*, 87 Ill. 2d 151, 157, 429 N.E.2d 526 1981 .

Here, in light of our conclusion that the State's evidence was overwhelming, it cannot be said that the alleged errors contributed to the conviction. Karlovic's testimony that Solomon told him and the grand jury that defendant was a shooter was duplicated by Brown's testimony. The potential prejudice from Pelligrini's testimony that he learned defendant's identity from Ayres was neutralized by the trial judge's ruling in a sidebar that prohibited more than the mere mention of Ayres to rebut defense counsel's question about a computer search. Even without Pelligrini's testimony that he learned the name from Ayres, the positive identification of defendant in lineups and photo arrays by Brown and Stamps was sufficient to

support the conviction. As to defendant's objection to Hartmann's testimony that he was the head of the Manor GDs, we do not believe that defendant's conviction was dependent on proving the State's theory that the shooting was for gang leadership. This evidence, even if admitted in error, did not contribute to the conviction. We conclude that the alleged errors of hearsay and Crawford violations in the testimony of Karlovic, Pelligrini and Hartmann were harmless beyond a reasonable doubt.

Defendant next argues he was prejudiced by prosecutorial misconduct during the course of the trial and in closing arguments. He contends that the prosecution 1 repeated the inadmissible hearsay statements of Solomon and Ayres 2 misstated the burden of proof in its closing arguments 3 attacked defendant s attorneys 4 violated the court order in limine on gang evidence 5 argued facts outside the record and 6 engaged in a pattern of misconduct that created reversible error. The State asserts that most of these issues are waived for failure to object at trial and raise the issues in a posttrial motion. Enoch, 122 Ill. 2d at 188 claims of error that are not supported by objections at trial and in a posttrial motion are waived .

We find that only one of these issues has been preserved for review. Both at trial and in his amended motion for a new trial, defendant objected to the prosecutor s comment that "jails throughout the United States are filled with people convicted of murder beyond reasonable doubt. It happens all the time. It happens every day."

In general a prosecutor is allowed a great degree of latitude in closing arguments. People v. Cisewski, 118 Ill. 2d 163, 175, 514 N.E.2d 970 1987 . A trial court's determination is allowed to stand absent a clear abuse of discretion. People v. Kirchner, 194 Ill 2d 502, 554, 743 N.E.2d 94 2000 . To constitute reversible error, the remarks must have resulted in

substantial prejudice to the accused and, absent the remarks, the verdict would have been different. *People v. Heard*, 187 Ill. 2d 36, 73, 718 N.E.2d 58 1999 .

Here, we cannot say that the prosecutor's general statement about the frequency of murder convictions constitutes reversible error. See *People v. Kidd*, 175 Ill. 2d 1, 40, 675 N.E.2d 910 1996 comments to the effect that the State proves people guilty of murder beyond a reasonable doubt "each and every day" do not diminish the State's burden of proof . Here, the court did not abuse its discretion when it allowed the comment but urged the prosecutor to return the focus to the case at hand. As to defendant's other claims of prosecutorial misconduct that are waived, we decline to consider them under the plain error doctrine. *People v. Mitchell*, 155 Ill. 2d 344, 354, 614 N.E.2d 1213 1993 . We did not find the evidence in this trial to be closely balanced or the errors to be of a magnitude that deprived defendant of a fundamentally fair trial. *Mitchell*, 155 Ill. 2d at 354.

Defendant's final claim is that due process and fundamental fairness warrant reversal because the cumulative prejudicial effect of the combined errors denied him a fair trial.

A new trial is not warranted where a defendant presents a myriad of arguments but fails to demonstrate any single reversible error because " t he whole can be no greater than the sum of its parts." *People v. Albanese*, 102 Ill. 2d 54, 82-83, 464 N.E.2d 206 1984 , abrogated on other grounds in *People v. Gacho*, 122 Ill. 2d 221, 262-63, 522 N.E.2d 1146 1988 . A defendant is not entitled to a new trial where there is neither error nor plain error. *People v. Caffey*, 205 Ill. 2d 52, 117-18, 792 N.E.2d 1163 2001 *People v. Hall*, 194 Ill. 2d 305, 350-51, 743 N.E.2d 521 2000 . Here, we have found only harmless error. We adopt the conclusion in *People v. Robinson*, 254 Ill. App. 3d 906, 921, 626

1-03-3130

N.E.2d 1242 1993 "we recognize that there must be a point where a combination of harmless error becomes so harmful that reversal is dictated because of the cumulative impact upon defendant's right to a fair trial. However, this case does not present such a situation."

Having concluded that Brown's hearsay testimony was admissible as a spontaneous declaration, that his properly admitted testimony contributed to the overwhelming weight of the evidence against defendant, that a reasonable jury could have found him guilty beyond reasonable doubt and that the other alleged errors were either harmless or waived and ineligible for plain error review, the judgment of the circuit court is affirmed.

Affirmed.

GORDON and McBRIDE, JJ., concur.

26