2019 IL App (1st) 172261-U

No. 1-17-2261

Order filed December 18, 2019

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 7306 |
| | ) | |
| DECAREE MITCHELL, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm, concluding the evidence was sufficient to prove defendant guilty beyond a reasonable doubt.

¶ 2    Following a jury trial, defendant, Decaree Mitchell, was found guilty of attempt first degree murder and aggravated battery. The trial court merged the aggravated battery conviction into the attempt first degree murder conviction, and sentenced him to 6 years in prison plus a 25-year enhancement for his personal discharge of a firearm, for a total of 31 years' imprisonment.

Defendant appeals, arguing the State failed to prove him guilty beyond a reasonable doubt. We affirm.

¶ 3    The State charged defendant with attempt first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012)) and aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2012)), alleging he shot Londrell Thomas causing great bodily harm. The matter proceeded to jury trial, at which the following evidence was presented.

¶ 4    Londrell, who had a 2008 felony conviction for possession of cannabis, testified that on April 6, 2013, he, his cousin, Jerry Thomas, and his nephew, Kevonte Thomas, drove to the 6200 block of South Marshfield Avenue in Chicago to check on his grandmother's house and also to pick up a Ford Explorer which he had left with his mechanic, Danny Curtis, who worked out of his home on the same block.[1] Londrell parked in front of Curtis's house. Londrell went to the backyard of Curtis's house to check on the Explorer. Kevonte went to Thomas's grandmother's house, which was "two houses down" from Curtis's house, and Jerry went across the street.

¶ 5    As Londrell walked through a gangway to the back of Curtis's house to look at the Explorer, defendant, whom Londrell identified in open court, walked past him. No words were exchanged. Londrell testified there was "bad blood" between him and defendant. In 2003, defendant and his friends shot out the windows of Londrell's Lexus. About one year before defendant shot Londrell, defendant, a person nicknamed "Law," and "Big Frank" approached Londrell inside a bar, and defendant said to Londrell, "if I wanted to get you, I could have got you."

---

[1] We will refer to Londrell Thomas, Jerry Thomas, and Kevonte Thomas by their first names to avoid confusion.

¶ 6 Curtis and Londrell checked on the Explorer. Londrell then walked through the gangway to the front of the house toward his car. Londrell saw defendant standing by his car on the driver's side, which was nearest Curtis's house. A person named "Law" was standing in the street, about two or three feet away from the passenger side of Londrell's car.

¶ 7 Londrell approached his car and grabbed the door handle. Defendant said, "I've got you now, mother***," as he pulled out a gun and shot Londrell in his leg. After the first shot, the gun jammed. Defendant unjammed the gun, and shot Londrell in the leg a second time. Londrell began to run away, and Law said "run, now, you b***-a*** n***; run, now, you b***-a*** n***." Law did not have a gun and did not shoot at Londrell.

¶ 8 Londrell ran toward his grandmother's house as defendant continued to shoot at him. According to Londrell, defendant "finally [ran] up on [him] close," and the gun jammed again. Defendant unjammed the gun and shot Londrell in his side and arm, and then "[took] off running."

¶ 9 After the shooting stopped, Londrell ran back to Curtis's house, and then came through the gangway to the front of Curtis's house. Curtis came outside, and Londrell said, "I'm hit, I'm hit." Curtis pulled Londrell inside his house, and Londrell laid on the couch.

¶ 10 Someone called 9-1-1, and the police were the first to arrive. A police officer pulled up, and Londrell told her, "Car-Car shot me." An ambulance arrived and took Londrell to Stroger Hospital. Londrell testified that his whole left side was paralyzed, and he was in a wheelchair for "about five, six months."

¶ 11 Londrell testified that, at the time of the shooting, he knew defendant only by his nickname, "Car-Car." Londrell had known defendant for "about 20 years." Defendant went to grammar school with Londrell's little brother. Londrell went to high school with defendant and his brother,

dated defendant's sister, and knew defendant's mother and father. Additionally, Londrell testified defendant was not wearing a mask or anything covering his face when defendant shot him, and it was light outside. Londrell was certain defendant was the person who had shot him multiple times.

¶ 12    On October 15, 2015, Londrell learned that "Car-Car's" name was either Decaree Mitchell or Jacari Mitchell. About a week later, Londrell obtained some photographs of defendant from Facebook and had them printed out. Londrell took the photographs to a detective.

¶ 13    On October 23, 2015, Londrell met with Detective Michael Demcak and viewed two photographic lineups. In one lineup, Londrell identified defendant as the shooter. That same day, Londrell was interviewed by Detectives Peter Muhney and Douglas Livingstone. During the interview, Londrell identified "Law" in photographs as being the same person present when defendant shot him. Londrell provided the detectives with the names of potential witnesses, including Jerry and Kevonte.

¶ 14    Londrell testified that Law was shot and killed across the street from where Londrell was shot on July 4, 2013. Londrell had known Law for "about four years," but did not know his real name. Law remained at the scene as Londrell was being put into the ambulance. Londrell never told the police Law was involved in the shooting. When the police arrived and asked Londrell what happened, he did not tell them that Jerry and Kevonte were witnesses to the shooting because they never asked. Nor did he tell the police Jerry and Kevonte had witnessed the shooting when questioned at the hospital because the police asked only who shot him. By the time Londrell was being loaded into the ambulance, both Kevonte and Jerry had left the area.

¶ 15    Kevonte testified that he was currently incarcerated in the Illinois Department of Corrections and had four prior felony convictions. Nothing was offered to Kevonte in exchange

for his testimony at trial. On April 6, 2013, Kevonte travelled with Londrell and Jerry to the 6200 block of South Marshfield Avenue. When they arrived, Londrell walked through the gangway to the back of Curtis's house to check on his car, and Kevonte and Jerry went to their grandmother's house. Kevonte stood right outside the front gate, eating a "snowball."

¶ 16    As Londrell walked through the gangway, a man Kevonte knew only as "Car-Car" walked out of the gangway toward Londrell's car. Kevonte identified defendant in open court as the man he knew as "Car-Car." A person Kevonte knew only as "Law" was standing close to defendant on the same side of Thomas's car

¶ 17    Londrell walked back through the gangway a few minutes later. Defendant was still standing by Londrell's car, looking around. Londrell walked toward his car and grabbed the door handle to enter the car, and defendant "ran over and shot." When Kevonte heard the shot, he looked over and knew Londrell had been shot. Londrell "took off running" toward his grandmother's house. After the first shot, defendant began "fumbling" with the gun, and ran in the same direction as Londrell. Kevonte did not see anyone other than defendant with a gun.

¶ 18    Kevonte was "a few feet away" from where defendant and Londrell were when defendant shot Londrell. Defendant was "really close" to Londrell when he first shot Londrell. Defendant ran right past Kevonte after the shooting. Kevonte testified it was light outside and there was nothing obstructing his vision. Kevonte had known defendant all his life, and had seen him on the 6200 block of South Marshfield numerous times.

¶ 19    Kevonte testified he did not want to cooperate with police when they began asking questions about Londrell's shooting because he does not testify in court against people. He prefers "to leave things in the streets" because the "streets can take care of themselves."

¶ 20     On January 23, 2016, Kevonte met with Detectives Liakopoulas, Muhney, and Livingstone while he was incarcerated in the Cook County jail, and identified defendant in a photographic lineup as Londrell's shooter.[2] He also identified Law in a photograph.

¶ 21     Kevonte "took off" before the police came because he "was afraid that [he] was going to get shot next" by "Car-Car" or whoever he was with. Kevonte did not call the police at the time to tell them he was a witness to the shooting. Nor did Kevonte tell the police he witnessed the shooting when he went to the hospital to visit Londrell. Kevonte did not tell the police he had witnessed the shooting at any time prior to January 23, 2016, when police spoke to him at the Cook County jail.

¶ 22     Curtis testified that on April 6, 2013, Londrell came to his house to check on his car, which was in the backyard. He and Londrell had a brief conversation in the backyard, after which Londrell left and walked through the gangway. Shortly after Londrell walked away, Curtis heard gunshots. Curtis then came through the gangway to look for his mother, who was out front.

¶ 23     Curtis saw Londrell was shot, and was "leaking blood." Curtis helped Londrell through the front door of his house and onto his couch, and Curtis put pressure on Londrell's leg. Londrell said "Car-Car" had shot him.

¶ 24     Just before Londrell arrived on April 6, 2013, Curtis was alone in the backyard of his house. He could not see the gangway from where he was, and he did not see defendant before Londrell came to his house.

¶ 25     On April 6, 2013, Curtis spoke with the police, and did not tell them that Londrell had said "Car-Car" shot him. Curtis testified he did not "give no second-hand information to no police and

---

[2] Detective Liakopoulas's first name is not identified in the record.

nobody else." Curtis spoke with the police six times and never told them that Londrell said that "Car-Car" had shot him because he was never asked.

¶ 26    Officer Nataly Janik testified that on April 6, 2013, she responded to a call that a person had been shot in the 6200 block of South Marshfield. Janik located Londrell inside a residence and entered through the front door. Londrell was in "grave condition" and was "bleeding pretty badly." Janik testified she asked Londrell who shot him, and he told her.

¶ 27    The parties stipulated that, if called to testify, Dr. Faran Bokhari would testify that he treated Londrell, who had one gunshot wound to his left thoracal abdomen, two gunshot wounds to his left upper arm, and two gunshot wounds to his left leg. Londrell's treatment consisted of multiple surgical procedures, and he remained hospitalized until April 15, 2013.

¶ 28    Muhney testified that on April 6, 2013, he and Livingstone went to the hospital and spoke with Londrell. After the conversation, he returned to the crime scene and canvassed the neighborhood in an effort to find the shooter. Efforts to locate the shooter were unsuccessful until October 2015, when he received two color photographs from Londrell. Before Muhney received the photographs, Londrell told him the shooter's name was either "Jahari Mitchell" or "Decari Mitchell." After he received the photographs, he learned the shooter's first name was spelled "Decaree." Defendant was depicted in the photographs.

¶ 29    On October 23, 2015, Muhney interviewed Londrell, who told him that Jerry and Kevonte were witnesses to the shooting. Londrell told Muhney another person named Law was "on the street" during the actual shooting. Londrell told him Law died on July 4, 2013. Muhney looked at the homicide report relating to Law's death and found he was named Marlon O'Banner. A gun was recovered from O'Banner's person at the time of his death.

¶ 30    After Londrell, Jerry, and Kevonte were interviewed, an arrest warrant was issued for defendant, who was located in Madisonville, Kentucky. Muhney and other officers travelled to Kentucky to escort him back to Chicago. As they were travelling back to Chicago, defendant told Muhney that a woman he had met on a dating website, Nichole Wyckoff, had sent him a plane ticket, and he flew to Kentucky. Muhney spoke with defendant again after they arrived back in Chicago, and defendant said "there was no way [he] could have been the shooter. Whenever the shooting occurred, it could not have been [him] because [he] was in Kentucky." Defendant told Muhney he met a woman named Nichole Wyckoff on a dating application. Defendant said Wyckoff came to Chicago to defendant's mother's house, and he and Wyckoff drove back to Kentucky on March 23, 2013.

¶ 31    Officer Steven Swain testified that on April 6, 2013, he responded to the 6200 block of South Marshfield to collect evidence. He observed two "WIN 9mm Luger" shell casings in the parkway, which he photographed and then placed in separate envelopes. He found blood stains in the gangway next to Curtis's house, as well as on the "front landing" and inside the house.

¶ 32    The parties stipulated that, if called to testify, Investigator Brian Smith would testify that on July 4, 2013, he was assigned to a homicide investigation in the 6200 block of South Marshfield Avenue. Upon arriving, he observed the body of O'Banner, who had suffered a gunshot wound to his left chest area. Smith recovered a black "high-point Model C9 9mm Luger semiautomatic handgun" from O'Banner's left waistband.

¶ 33    The parties also stipulated that, if called to testify, Joseph Thibault would testify that he analyzed the two shell casings recovered by Swain, and he would opine, to a reasonable degree of scientific certainty, that they were fired from the same firearm. Brian Parr testified he performed

a tool-mark identification analysis on the two fired shell casings and the gun recovered from O'Banner's person, and it was his opinion, within a reasonable degree of scientific certainty, that the two fired shell casings recovered by Swain were fired by the gun recovered from O'Banner.

¶ 34    The State rested, and defendant moved for a directed verdict. The trial court denied the motion.

¶ 35    William Forrow testified he was defendant's stepbrother. He introduced defendant to Wyckoff, whom defendant had seen on Forrow's Facebook page. On March 23, 2013, Forrow, Collette Rogers, and Wyckoff, drove from Madisonville, Kentucky, to Chicago to pick up defendant because defendant wanted to attend Forrow's birthday party in Madisonville on April 12, 2013. The three left Kentucky around 2 or 2:30 p.m. and arrived at defendant's mother's house around 8 or 8:30 p.m. after stopping to see Forrow's father and aunt.

¶ 36    Forrow, Rogers, Wyckoff, and defendant left Chicago around 1:30 or 2 a.m. on March 24, 2013, and drove back to Kentucky. Defendant lived with Forrow from March 24, 2013, until he was arrested on March 29, 2016. During that time period, defendant remained in Kentucky "most of the time." Defendant did not leave Kentucky to go to Chicago on April 6, 2013.

¶ 37    Defendant's mother, Arlene Farr, testified that defendant lived with her in Chicago but he left in the middle of March 2012, 2013, or 2014 to live with Forrow in Kentucky. On the day he left, Forrow, Rogers, and Wyckoff came to pick defendant up at her house. Defendant grabbed a duffle bag and told Farr he was going to Kentucky for Forrow's birthday "bash." Forrow, Rogers, Wyckoff, and defendant left her house at 1:30 or 1:45 a.m. the next morning. Defendant returned to Chicago on July 4, 2013, to attend "Law's" funeral. Farr confirmed defendant's nickname was "Car-Car."

¶ 38 Wyckoff testified that on March 23, 2013, she went to Chicago with Forrow and Rogers. When they arrived, she and defendant went to Loyola Beach. At around 1:00 a.m., she and defendant returned to his mother's house, and she, defendant, Forrow, and Rogers left to go back to Kentucky. To her knowledge, defendant never left Kentucky after he moved there. She never gave defendant money to fly to Kentucky, never told the police she had done so, and defendant never flew to Kentucky.

¶ 39 Wyckoff testified she did not remember speaking to Livingstone on April 21, 2016. Nor did she remember speaking with any Chicago police detectives regarding the case. Wyckoff did not tell a detective she met defendant on a dating website in April 2013, and she did not tell a detective she spoke to defendant about five times per day for three or four days before driving to Chicago to meet defendant. She never told a detective she stayed at defendant's mother's house for two or three days before driving back to Kentucky alone. She never told a detective she continued to speak with defendant for five to seven days after her return to Kentucky. She never sent $275 to defendant to relocate to Kentucky, and denied telling a detective she did so. She also denied telling a detective that several days after she sent defendant money, he arrived with an "unknown friend."

¶ 40 In rebuttal, the State called Livingstone, who testified that on April 21, 2016, he spoke with Wyckoff. Wyckoff told him that she met defendant at the beginning of April 2013 over an unknown dating website. She and defendant spoke every day on the phone and, after three or four days, she drove to Chicago, where she stayed with defendant and his mother. Wyckoff told Livingstone that, after two to three days in Chicago, she returned to Kentucky by herself. After her return to Kentucky, Wyckoff and defendant continued to speak on the phone for five to seven days,

after which she sent him $275 so he could relocate to Kentucky. Several days later, defendant appeared in Kentucky with an "unknown friend."

¶ 41    The jury found defendant guilty of attempt first degree murder and aggravated battery, and found he personally discharged a firearm causing great bodily harm. Defendant filed a motion for new trial, which the trial court denied.

¶ 42    The trial court merged the aggravated battery conviction into the attempt first degree murder conviction, and sentenced defendant to 6 years in prison plus a 25-year enhancement for his personal discharge of the firearm, for a total of 31 years' imprisonment. This appeal followed.

¶ 43    Defendant argues the State failed to prove him guilty beyond a reasonable doubt. Specifically, defendant contends his conviction must be reversed where it was largely based on the inconsistent and incredible testimony of two convicted felons, Londrell and Kevonte, and where no physical evidence tied him to the offense. We disagree.

¶ 44    When a defendant presents a challenge to the sufficiency of the State's evidence, "a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted; emphasis in original.) *People v. Ross*, 229 Ill. 2d 255, 272 (2008). The reviewing court does not retry the defendant, and "the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence." *Id.* The mere fact that the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee reasonableness of the decision. *Id.* A criminal conviction will

be set aside where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 45    We conclude the evidence presented was sufficient to support defendant's conviction. To prove defendant committed the offense of attempt first degree murder as charged, the State was required to prove defendant, without lawful justification and with the intent to commit murder, shot Londrell, which constituted a substantial step toward the commission of the first degree murder of Londrell, causing great bodily harm. 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012); 720 ILCS 5/8-4(c)(1)(D) (West 2012). In this case, the State presented testimony from two eyewitnesses, Londrell and Kevonte, who testified defendant shot Londrell. See *People v. Blankenship*, 2019 IL App (1st) 171494, ¶ 24 (citing *People v. Gray*, 2017 IL 120958, ¶ 36) (testimony of a single eyewitness is sufficient to convict if the testimony is positive and credible, even if contradicted by the defendant).

¶ 46    The eyewitness testimony established that, on April 6, 2013, Londrell, Jerry, and Kevonte drove to Curtis's house in the 6200 block of South Marshfield to pick up Londrell's car which was being repaired by Curtis. As Londrell walked through the gangway to the back of Curtis's house, he walked past defendant, who he had known for about 20 years but knew only by the nickname "Car-Car," and with whom he had "bad blood." Defendant walked out of the gangway and lied in wait with O'Banner by Londrell's car. When Londrell returned to his car, defendant told him, "I got you now, motherf***," as he pulled out a gun and shot Londrell in the leg.

¶ 47    Defendant continued to shoot at Londrell while he ran away. When his gun did not fire, he unjammed it and continued to shoot, hitting Londrell again in the leg, twice in the arm, and once in the chest, all while O'Banner was jeering at Londrell to "run, now, you b***-a***, n***." The

gun which was used to shoot Londrell was recovered three months later in the waistband of defendant's deceased associate, O'Banner. On the day of the shooting, Londrell told Curtis and police officers, on two separate occasions, he was shot by "Car-Car," which defendant's mother confirmed at trial was defendant's nickname.

¶ 48    Defendant does not argue Londrell's and Kevonte's identifications of defendant as the shooter were unreliable when assessed under the factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972), which in fact support the reliability of the identifications. Londrell and Kevonte observed defendant, whom both had known for many years, shoot Londrell in broad daylight, were in close proximimity to him when he did so, and defendant did nothing to conceal his identity. See *e.g.*, *People v. Slim*, 127 Ill. 2d 302, 307 (1989) (eyewitness testimony sufficient if the witness viewed the accused under circumstances permitting a positive identification); see also *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 13 (An eyewitness identification is sufficient to sustain conviction where the victim viewed defendant at close range and under relatively good light, and where the victim "testified that he *recognized* defendant as someone whom he knew." (Emphasis in original.)). Within minutes of the shooting, Londrell told the police his attacker was "Car-Car," and Londrell maintained his attacker was named "Car-Car" when he later spoke to police at the hospital. See *People v. Sullivan*, 366 Ill. App. 3d 770, 783 (2006) (identification found reliable, in part, where the witness identified the defendant by nickname on the night of the offense).

¶ 49    Instead, defendant contends the testimony of Londrell, Kevonte, and Curtis was inconsistent, incredible, and insufficient to support the finding of guilt. Defendant points to several facts which impeached the credibility of the State's witnesses, such as Londrell and Kevonte's prior convictions, Londrell's inability to identify defendant as "Car-Car" for more than two years

despite his multiple connections to defendant's family, Londrell's failure to inform the police that Kevonte and Jerry witnessed the shooting, Kevonte's reluctance to give information to the police and his preference to "leave things in the streets," and Curtis's failure to tell police that Londrell told him that "Car-Car" had shot him.

¶ 50    Defendant essentially asks this court to retry his case and reweigh the evidence against him. We decline to do so. *Ross*, 229 Ill. 2d at 272. The jury was fully aware of the alleged infirmities asserted by defendant and heard defense counsel argue them expressly during closing argument. It was the jury's function, and not this court's, to resolve those infirmities and determine whether the State had met its burden of proof. See *People v. Tenney*, 205 Ill. 2d 411, 428-29 (2002). The testimony of these witnesses was not "so wholly incredible or so thoroughly impeached that it [was] incapable of being used as evidence against defendant." *Sanders*, 2012 IL App (1st) 102040, ¶ 15. Accordingly, we conclude the State's evidence was sufficient to sustain defendant's conviction.

¶ 51    We note that defendant argues Londrell, Kevonte, and Curtis's testimony was inconsistent but fails to offer any specific inconsistencies. Our review of the record shows Londrell's and Kevonte's accounts of the shooting were consistent—except for their testimony as to where O'Banner was standing when Londrell returned to his car—and, while Curtis did not observe the shooting, he otherwise corroborated their accounts.

¶ 52    Defendant also argues the State failed to present any evidence connecting him to the offense other than the testimony of Londrell, Kevonte, and Curtis. According to defendant, the State presented no evidence of a motive, no physical evidence, and no self-incriminating statements, and defendant presented an alibi to explain his whereabouts on the day of the shooting.

¶ 53    The State was not required to establish a motive to sustain defendant's conviction. See *People v. Furdge*, 332 Ill. App. 3d 1019, 1023 (2002). Nor was the State required to present any physical evidence to connect defendant to the offense. See *People v. Herron*, 2012 IL App 090663, ¶ 23. The fact the gun used to shoot Londrell was later recovered from O'Banner rather than defendant did not require a finding that defendant did not shoot Londrell, particularly where there was evidence defendant and O'Banner were together on the date of the shooting.

¶ 54    The jury was also free to reject defendant's alibi that he moved from Chicago to Kentucky several weeks before the offense and was not present in Chicago when Londrell was shot. "The weight to be given alibi evidence is a question of credibility for the trier of fact [citation], and there is no obligation on the trier of fact to accept alibi testimony over positive identification of an accused." *People v. Slim*, 127 Ill. 2d at 315. Here, defendant's alibi defense was contradicted by two eyewitnesses who saw defendant shoot Londrell. Moreover, defendant's alibi defense was undercut by Wyckoff's prior statement to the police, wherein she told detectives that: (1) she met defendant in April 2013 on a dating website, (2) she spoke to him for three to four days, (3) she came to Chicago and stayed with defendant and his mother for two to three days, (4) she drove back to Kentucky alone, (5) she continued to speak with defendant on the telephone for five to seven days, (6) she then sent defendant money to relocate to Kentucky, and (7) defendant arrived with an "unknown friend" several days later, *i.e.*, after the date of the shooting. The jury was free to resolve this conflict in favor of the State. See *id.*

¶ 55    In sum, the State presented sufficient evidence to prove defendant guilty of attempt first degree murder beyond a reasonable doubt. The eyewitnesses' testimony was not so improbable as to be incapable of belief and was sufficient to establish defendant shot Londrell with the intent to

kill him. The jury was free to assess the credibility of the witnesses and to disbelieve defendant's alibi defense, and the lack of physical evidence connecting defendant to the offense was not fatal to the State's case. Accordingly, any rational finder of fact could have found the essential elements of the offense beyond a reasonable doubt.

¶ 56    For the reasons stated, we affirm the trial court's judgment.

¶ 57    Affirmed.