FIFTH DIVISION
August 17, 2007

No. 1-05-1849

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| ANTONIO HOWARD, | ) | Honorable |
| | ) | Colleen McSweeney-Moore, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GALLAGHER delivered the opinion of the court:

Following a bench trial, defendant Antonio Howard was convicted of armed robbery and two counts of aggravated discharge of a firearm. He was sentenced to 30 years in prison for the armed robbery count and 15 years for the aggravated discharge counts, with the latter sentences to run concurrently. On appeal, defendant contends that the evidence presented by the State at trial failed to prove him guilty beyond a reasonable doubt. Alternatively, defendant argues that he is entitled to a new trial because the trial court violated his sixth amendment right to counsel of his choice when it permitted his attorney to withdraw over his objection. For the reasons set forth below, we affirm defendant's convictions for armed robbery and aggravated discharge of a firearm. We also hold that the trial court did not abuse its discretion by permitting defendant's trial counsel to withdraw.

BACKGROUND

On the morning of October 10, 2002, Frederick Thomas and Perry King arrived by car at a Chicago Housing Authority (CHA) housing project at 4120 South Prairie Avenue seeking day labor for the contracting business of Thomas's brother. Thomas and King were the primary victims of defendant's actions and the State's lead witnesses in its case against defendant.

At about 7:30 a.m., Thomas got out of King's car and approached the entrance to the CHA building. King remained behind in the driver's seat. King testified initially that from his vantage point he could not see the entrance of the building and that he lost sight of Thomas for "three or [four] seconds, minutes or something" before Thomas returned. King later clarified that he meant three or four minutes. Consistent with his previous statement, King testified under cross-examination that he lost sight of Thomas for "two or three minutes, seconds or something. A very short time." Under cross-examination, however, King testified that he believed he saw Thomas enter the building.

Thomas testified that as he neared the CHA building, defendant approached him from behind and asked if he had any money. On cross-examination, Thomas recalled defendant confronted him "maybe four steps" from the entrance of the building. After Thomas told defendant he had no money, defendant hit him once on the left cheek and twice in the back of the head with a semiautomatic pistol. Thomas testified that he was certain defendant hit him with that type of weapon because it had a clip rather than a revolving chamber.

After defendant struck Thomas, Thomas handed defendant a $10 bill and walked back to King's car because he feared for his safety. On cross-examination, Thomas stated that he saw

defendant's face for "about 20 or 15 minutes." Asked if he was "having a conversation" with defendant, Thomas answered, "I didn't have [a] conversation with him. He had a weapon and he was scared and he had me standing there." Thomas later stated he was unsure how long the encounter lasted. Upon returning to the car, Thomas told King he had been robbed of $10. King testified that he saw a "hole" in Thomas's head and "a lot" of blood, some of which dripped onto the car's interior.

Defendant then approached the street and King, parked across the street, backed his car up within 15 feet of defendant to confront him. Thomas testified King stopped the car about two car lengths away from defendant and "hollered out the car [*sic*]. He said what is happening, man[?]" King similarly testified that he backed up the car to "see what he hit [Thomas] like that for." Under cross-examination, Thomas testified that he, at some point, told King that defendant had a gun.

Thomas and King both testified that defendant pulled out a pistol and began firing at the car. King recalled that defendant pulled out a black semiautomatic pistol and fired "[m]aybe three, four, maybe five" shots, holding the weapon sideways in his right hand. Although King initially stated that he observed defendant in the car's mirrors, under cross-examination, King said he watched defendant through the left rear passenger window. King said defendant ran into the middle of the street as he fired the weapon.

Thomas testified that he heard defendant fire "three or four gunshots" at the car and that he was facing forward and looking away from defendant. Thomas claimed he could see defendant firing the weapon through King's rearview mirror, however, and that defendant was in the middle

3

of the street. According to Thomas, King "pulled away in a speed that, you know, that the bullet wouldn't hit the car." Similarly, King testified that he "pulled out to keep ahead of" defendant, estimating the car's speed at 25 miles per hour. Thomas and King testified they heard a single bullet ricochet off the car.

Thomas testified that they flagged down a police car at 35th and State, although Thomas said he was disoriented from his head wound and could not remember how long it took to locate help. Thomas also testified that King drove south, while King testified they drove north. Although King testified that they located police at 39th and State, that intersection, like 35th and State, is north of the CHA building.

The State also presented the testimony of Derrick Gardner, who was driving south on Prairie Avenue to look at potential property investments in the neighborhood. Gardner stated that as he approached the intersection of 41st Street and Prairie Avenue, he witnessed defendant fire a gun at King's vehicle. Gardner testified that as he neared the scene, King's car was facing north and was "kind of in the middle of the street," which is what drew Gardner's attention.

Gardner recalled that defendant was standing on the same side of the street as the CHA building and was "on the [curb] – like right off the [curb] in the street" as he fired at King's car. Gardner testified King's car was speeding northbound when it passed within five feet of his own car and that defendant fired two or three shots at King's vehicle. Consistent with King's account, Gardner testified defendant held his firearm sideways in his right hand.

On cross-examination, Gardner recalled he stopped his car 10 or 15 feet from defendant for "two or three seconds" and backed up toward 41st Street while keeping his eyes on defendant.

When the two men made eye contact, Gardner claimed that defendant fired a shot in his direction. Gardner then ducked his head down and drove west on 41st Street. Gardner dialed 911 on his cell phone and told police that a light-skinned African-American male wearing a black coat and a black hood was firing a gun at the intersection of 41st Street and Prairie Avenue. Gardner then flagged down two police officers near the intersection of 45th and Michigan.

Chicago police officer Arthur Davis testified that at approximately 7:30 a.m., he was dispatched to investigate a report of shots fired by a light-skinned African-American male wearing a black coat and a black hood in front of the CHA building. Upon arriving at the scene, Davis saw defendant standing on the street across from the CHA building wearing a black coat and a hood. Davis testified he approached defendant, but did not immediately place him in custody.

Gardner then returned to the scene with the two officers he had flagged down and identified defendant as the gunman. Under cross-examination, Gardner stated that when he arrived at the scene, defendant was being questioned by only one officer and was not in handcuffs. Gardner recalled that King and Thomas returned to the scene after he did. Officer Davis recalled, however, that Gardner, Thomas and King arrived "almost simultaneously."

Thomas testified that when they returned, two or three police officers were present and that defendant was leaning against a car. King testified that defendant was in handcuffs when they arrived. According to Thomas, when he approached defendant, defendant stated, "I didn't do anything to these guys here." King also recalled defendant making a similar remark upon seeing the two men arrive.

Officer Davis transported defendant to the second district police station where he

conducted a custodial search and recovered a $10 bill from defendant's pocket. A firearm was not recovered. Defendant's right hand tested positive for gunshot residue, which, according to the State's forensic scientist, established within a reasonable degree of scientific certainty that defendant discharged or was in the environment of a discharging weapon or that he touched something with gunshot residue on it.

Police photographs entered into evidence depicted (1) Thomas's face and head where he was injured; (2) King's car parked outside the police station; and (3) the license plate of King's car with an indentation that the police forensic investigator testified was consistent with a bullet ricochet. King testified that his car was five days old and that the dent was not there before the shooting. No photographs were taken of the interior of King's car and no bullets or shell casings were recovered from the scene. The parties stipulated that Thomas was a three-time convicted drug offender and that defendant previously had been convicted of possession of a controlled substance with intent to deliver.

At the close of evidence, the court stated that Thomas, King and Gardner provided credible testimony that corroborated one another's accounts. The court also noted that Gardner was an independent eyewitness. The court further noted that the testimony of Gardner and Officer Davis established that defendant was not in custody when he was first identified by Gardner and that all of the witnesses "immediately identified the defendant as the shooter" upon seeing him. The court convicted defendant of armed robbery and aggravated discharge of a firearm but acquitted him of attempted murder. Defendant was sentenced to 30 years in prison for armed robbery and 15 years for each count of aggravated discharge of a firearm, with the

1-05-1849

latter sentences to run concurrently.

ANALYSIS

I. Sufficiency of the Evidence

Defendant contends that the evidence presented at trial failed to meet the State's burden of proving his guilt beyond a reasonable doubt. He concedes that the prosecution established the elements of armed robbery and aggravated discharge of a weapon. Nevertheless, he contends that the evidence was contradictory and implausible and does not establish that he was the robber or the gunman.

When reviewing the sufficiency of the evidence of a criminal conviction, it is not this court's role to retry the defendant; rather, we determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979); *People v. Ward*, 215 Ill. 2d 317, 322, 830 N.E.2d 556, 558-59 (2005). Indeed, "[i]t is the trier of fact's responsibility to determine the witnesses' credibility and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence; we will not substitute our judgment for that of the trier of fact on these matters." *People v. Brooks*, 187 Ill. 2d 91, 131, 718 N.E.2d 88, 111 (1999).

Further, a trial court, having heard the evidence and drawn all reasonable inferences therefrom, is "'not obligated to accept any possible explanation compatible with the defendant's

7

innocence and elevate it to the status of reasonable doubt.'" *People v. Sutherland*, 223 Ill. 2d 187, 272, 860 N.E.2d 178, 233 (2006), quoting *People v. Evans*, 209 Ill. 2d 194, 212, 808 N.E.2d 939, 949 (2004). A conviction will only be reversed when "the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Sullivan*, 366 Ill. App. 3d 770, 782, 853 N.E.2d 754, 766 (2006).

Defendant's principal contention is that the State's witnesses were not credible. Specifically, defendant attempts to impeach Thomas's testimony on the basis that his prior drug possession convictions tarnish his credibility. Defendant further alleges that several inconsistent statements by witnesses about the length of time in which the robbery occurred and the exact location from which defendant was shooting "cannot simply be explained away by the vagaries of memory."

In particular, defendant notes that: (1) Thomas stated that he thought he saw defendant's face for "20 or 15 minutes" during the robbery but later could not remember how long the encounter lasted; (2) King and Thomas offered conflicting testimony about whether the robbery took place inside or outside the CHA building; (3) King and Thomas gave conflicting accounts about the direction in which they left the scene; (4) King's and Thomas's statements that they drove away slowly were not believable if defendant was firing a gun at them; and (5) their credibility was further harmed by the implausible notion that they would confront an armed assailant.

We find these challenges to the credibility of the State's witnesses to be meritless. As the State correctly points out, although there were minor inconsistencies in the testimony, all of the

witnesses testified consistently regarding the facts most pertinent to the State's case, precisely: (1) the time and location of the robbery and shooting; (2) that the gunman shot repeatedly; (3) that he held the gun in a distinct manner in his right hand; and (4) that defendant matched the description of the shooter.

Indeed, as the Illinois Supreme Court has held, variations in witness testimony are "to be expected anytime several persons witness the same event under traumatic circumstances." *Brooks*, 187 Ill. 2d at 133, 718 N.E.2d at 112. It is not the role of this court to reevaluate the credibility of witnesses in light of inconsistent testimony and ostensibly retry the defendant on appeal. *People v. Milka*, 211 Ill. 2d 150, 178, 810 N.E.2d 33, 49 (2004). Whether minor inconsistencies in testimony irreparably undermined the credibility of the State's witnesses was a matter for the trier of fact to decide. The same can be said of the impact of Thomas's three felony convictions on the credibility of his testimony. A convicted felon is not automatically precluded from providing credible testimony. The record reflects that the trial court expressly found the testimony of the State's witnesses, including Thomas, to be credible.

We also note that at no point does defendant challenge the independent eyewitness testimony of Gardner, on whose testimony the trial court heavily relied when considering the charges of aggravated discharge of a firearm. Although Thomas and King testified that they drove away at approximately 25 miles per hour when defendant began firing, the trial court could have reasonably concluded from Gardner's testimony that King's car sped off more quickly, as one might expect. "The trier of fact is free to resolve inconsistencies in testimony and is free to accept or reject as much or as little of a witness's testimony as it pleases." *Sullivan*, 366 Ill. App.

1-05-1849

3d at 782, 853 N.E.2d at 766. That King and Thomas underestimated or misstated the speed of their vehicle does not call their entire testimony into question. Similarly, the fact that King and Thomas had difficulty estimating time throughout the trial and that Thomas testified that he saw defendant's face for "20 or 15 minutes" during what seemed to be a brief encounter does not compel a finding that their testimony was not credible, given the consistency with which they testified to the essential elements of the offenses. See *People v. Lewis*, 165 Ill. 2d 305, 356, 651 N.E.2d 72, 96 (1995) (eyewitness testimony alone may be sufficient to prove defendant guilty beyond reasonable doubt when, after considering "totality of the circumstances," court determines eyewitnesses had ample opportunity to observe defendant commit crime).

Lastly, much of the alleged implausibility to which defendant points in the record is rationally explained. Although defendant asserts that no reasonable person would confront an armed man and that, accordingly, King's version of the facts should be disregarded, the record does not reflect that King necessarily knew defendant was armed with a gun when he began to back his car up. Instead, the testimony only established that Thomas told King at some point that defendant had a weapon.

Defendant also asserts that because the record was devoid of much of the evidence that one would expect to find at the crime scene, the State failed to prove his guilt beyond a reasonable doubt. In particular, he contends that the State failed to provide: (1) photographic evidence of the interior of the car where, according to King's testimony, blood dripped from Thomas's wound; (2) physical or photographic evidence of shell casings and bullets at the scene; and (3) evidence of bullet holes in King's car.

10

1-05-1849

Defendant misunderstands our standard of review. The question on appeal is whether the evidence actually presented by the State, viewed in the light most favorable to the prosecution, establishes defendant's guilt beyond a reasonable doubt. See *Jackson*, 443 U.S. at 318-19, 61 L. Ed. 2d at 573, 99 S. Ct. at 2788-89. Once the State has met its burden, this court need not consider whether more evidence was presented. At trial, the State offered (1) credible testimony of three eyewitnesses; (2) four positive in-court identifications of defendant at the scene of the crime; (3) a positive gunshot residue test from defendant's right hand; (4) photographic evidence of an indentation in the license plate of King's new car which a police forensic investigator testified was caused by a bullet ricochet; (5) testimony indicating defendant fit the description provided in Gardner's 911 call; and (6) testimony that a $10 bill was recovered from defendant, which was precisely the currency taken from Thomas.

Defendant nevertheless urges us to place great weight on the following points: "anyone" could carry a $10 bill; his clothing and complexion are commonplace; gunshot residue could have come from anywhere; King's license plate could have been dented beforehand; no weapon or shell casing were found on him or at the scene; and if he had disposed of the evidence, he would not have returned to the crime scene. Viewing the totality of the evidence in the light most favorable to the State, however, we find these assertions, along with defendant's allegations about the probative value of missing evidence, unpersuasive. As to defendant's latter two contentions, whatever his motive for returning to the scene, the testimony of the State's witnesses establishes that defendant had ample opportunity to discard his weapon before Officer Davis arrived.

We also briefly address his contention that the absence of bullet holes in King's car is

11

probative of his innocence. Defendant alleges that if he were indeed firing at King and Thomas from such close range, he would have hit more than the license plate. We note that the State charged defendant with aggravated discharge of a firearm, armed robbery and attempted murder, and the trial court acquitted him of the latter charge. Perhaps if defendant's aim was better or if his intentions were worse, bullet holes indeed would have been found in King's car. However, all parties involved are fortunate that lives were not put at greater risk.

Defendant also challenges the circumstances of his arrest at the scene, contending that because the police presented him to witnesses while he was in handcuffs, the identification of him as the gunman was a suggestive "showup." In particular, defendant notes that King's testimony established he was in handcuffs when King and Thomas made their identifications. He also points out that all identifications were made while he was flanked by police officers. Relying on *United States v. Wade*, 388 U.S. 218, 234, 18 L. Ed. 2d 1149, 1161-62, 87 S. Ct. 1926, 1936 (1967), and *People v. Carroll*, 12 Ill. App. 3d 869, 874, 299 N.E.2d 134, 138 (1973), defendant argues that the presence of police officers and handcuffs cast serious doubt on the credibility of the identifications.

In response, the State cites a litany of authority that a showup, even conducted with a suspect in handcuffs, does not automatically weaken the veracity of an identification. See, *e.g.*, *People v. Smith*, 274 Ill. App. 3d 84, 653 N.E.2d 944 (1995); *People v. Johnson*, 262 Ill. App. 3d 781, 635 N.E.2d 827 (1994); *People v. Hughes*, 259 Ill. App. 3d 172, 632 N.E.2d 251 (1994); *People v. Frisby*, 160 Ill. App. 3d 19, 512 N.E.2d 1337 (1987). The State contends that one-person showups, while suggestive, are justified and proper where, as here, police respond to

reports of criminal activity and present a suspect for identification shortly after a crime. Accordingly, the State argues that this court must consider the "totality of the circumstances" surrounding the showup and whether the identifications are reliable in light of the witnesses' opportunities to observe the defendant. See *Stovall v. Denno*, 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 1206, 87 S. Ct. 1967, 1972 (1967) (holding that "a claimed violation of due process of law in the conduct of a [showup] confrontation depends on the totality of the circumstances surrounding it"), *overruled on other grounds*, *Griffith v. Kentucky*, 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708 (1987).

We agree with the State's assertions. Defendant's reliance on *Wade* and *Carroll* is misplaced; neither case sets out a bright-line rule that the presentation of a suspect to witnesses while flanked by police automatically calls an identification into question. See *Wade*, 388 U.S. at 234, 18 L. Ed. 2d at 1161-62, 87 S. Ct. at 1936; *Carroll*, 12 Ill. App. 3d at 874, 299 N.E.2d at 138. Indeed, as the State points out, *Carroll* held that the presentation of a handcuffed witness did not weaken the credibility of an identification which stemmed from an independent observation of the defendant committing the crime and which was not influenced by undue suggestion. *Carroll*, 12 Ill. App. 3d at 875, 299 N.E.2d at 139.

In the instant case, the trial court denied defendant's motion for a directed verdict on this issue, noting that a showup identification is permissible "when a short period of time elapses between an offense *** and an identification." Here, the testimony of the State's witnesses established that the identifications took place shortly after the shooting. See *Hughes*, 259 Ill. App. 3d at 174, 632 N.E.2d at 255 (identification within 20 minutes of an offense where

13

1-05-1849

witnesses all had ample opportunity to observe defendant was not questionable). Moreover, although Officer Davis testified that the witnesses arrived on the scene "almost simultaneously," the testimony of Gardner and King indicates that Gardner arrived first and identified defendant before he was in handcuffs. Regardless, all witnesses had ample opportunity to observe defendant closely, and their identifications came shortly after the shooting. See *People v. Morissette*, 150 Ill. App. 3d 431, 438, 501 N.E.2d 781, 786 (1986) (reliability of witness's identification is "the linchpin in determining the admission of identification testimony"), citing *Manson v. Brathwaite*, 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253 (1977).

In conclusion, defendant has mined the trial court record and presented several inconsistencies in eyewitness testimony. After a careful examination of the record, we conclude that these inconsistencies are not material and do not substantially undermine the State's case. Furthermore, the alleged "missing evidence" relied upon by defendant is insufficient to cast reasonable doubt on his guilt. After viewing the evidence in the light most favorable to the prosecution, we conclude that the evidence was sufficient to establish defendant's guilt beyond a reasonable doubt. Accordingly, we affirm defendant's convictions for armed robbery and aggravated discharge of a firearm.

## II. Defendant's Right to Counsel of His Choice

Defendant next contends that his sixth amendment right to counsel of his choice was

violated when the trial court permitted his attorney to withdraw. Because the trial court permitted the attorney to withdraw over his objection, defendant argues that the trial court abused its discretion and, accordingly, that he is entitled to a new trial.

We briefly recount the pretrial events relevant to this issue. Initially, the trial court appointed a public defender to represent defendant because he could not afford an attorney. Defendant, apparently with the financial assistance of his mother, subsequently retained attorney Raymond Hough to represent him, and the trial court permitted the public defender to withdraw.

Hough represented defendant in a hearing on a motion to suppress evidence on August 27, 2003. Following the trial court's denial of the suppression motion, a jury trial was scheduled for December 8, 2003. On that date, however, the State was not ready to proceed due to the absence of a witness. The court asked Hough, who consulted with the prosecutor before the hearing, if he and the State had agreed to a new jury trial date, and the following exchange occurred:

"MR. HOUGH: Your Honor, what I think – what I'm going to have [to] do *** is withdraw from this case. I would ask leave to do that.

THE COURT: Why?

MR. HOUGH: There's been a total terrible lack of communication between me and the people who retained me. Mr. Howard is in custody. Obviously I can communicate with him. But certain other people that I need to communicate with have been totally unavailable. No phone numbers. No phone calls.

1-05-1849

THE COURT: Mr. Howard, what is your motion [*sic*] on your attorney withdrawing?

DEFENDANT: I don't want him to withdraw. My moms [*sic*] said she['s] been calling him, but she hasn't been getting no answer. I told him I have a number that she gave me so he can call so [he] can talk to her.

MR. HOUGH: Your Honor, I have no information [that] his mother had called me. *** There's no way I can contact them. He's in custody. He can't help me. So I need these peoples' [*sic*] cooperation. *** What [defendant] said here in open court is totally untrue. There have been no phone calls from his people and no messages and no numbers which I can call or [an] address where I can reach them at. It makes it virtually impossible for me to represent the man without communication.

DEFENDANT: You don't come see me either.

MR. HOUGH: Now, what he said sounds like he's disappointed with my representation anyway. So for all those reasons, Judge, I would be –

DEFENDANT: The money is paid. I don't owe you nothing but a little bit more.

THE COURT: You know, what, Mr. Hough –

MR. HOUGH: Yes, Judge.

THE COURT:  You need to put your request in writing."

Hough filed a written motion, which stated simply "[t]hat their [*sic*] exist serious communication problems between the defendant at [*sic*] his attorney."  On January 9, 2004, the court questioned defendant and Hough at a hearing on the motion:

"THE COURT:  Do you [defendant] have any objection to [Hough] no longer representing you?

DEFENDANT:  I don't understand.  What can I do?

THE COURT:  Well, he says that the reason he is asking to withdraw is because you are not communicating with him.

DEFENDANT:  He is not communicating with me.  I am locked up. Personally, I am ready to get it over with.

THE COURT:  Well, the issue right now is whether you have any objection to your attorney withdrawing and no longer representing you.  I will appoint another attorney to represent you.  We won't be getting it over with because we will be starting at square one again.

DEFENDANT:  Well, I don't want to do that."

Hough responded by noting defendant's apparent dissatisfaction with his representation and reiterating that his communication problems were not with defendant but, rather, with the person who retained him as defendant's attorney.  Specifically, Hough stated:

"It is not [defendant]. As he said, he is in custody, but the people who have retained my services are not communicating with me.*** The people principally – I will be honest with you. It is his mother. She has returned no phone calls. She has no phone number which [*sic*] I can reach her.

The last time we were in court, I made these representations to your Honor and that ha[s]n't changed since that time. *** I don't know how I am going to continue to represent him under these circumstances."

The court granted Hough's motion to withdraw and again appointed a public defender to represent defendant. Following a series of continuances due to discovery delays, a bench trial commenced on October 27, 2004.

The sixth amendment to the United States Constitution provides "[i]n all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defense." U.S. Const., amend. VI; see also Ill. Const. 1970, art. 1, §8 ("In criminal prosecutions, the accused shall have the right to appear and defend in person and by counsel"). As the United States Supreme Court has held, "the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159, 100 L. Ed. 2d 140, 148, 108 S. Ct. 1692, 1697 (1988); but see *United States v. Gonzalez-Lopez*, 548 U.S. ___, ___, 165 L. Ed. 2d 409, 418, 126 S. Ct. 2557, 2562 (2006) (holding that, outside established limitations, the sixth amendment guarantee of fairness requires that "the accused be defended by the counsel he believes to be best"). Accordingly, although the right to counsel of

18

choice is a fundamental right, it is not absolute and is limited in several important respects. See *People v. Holmes*, 141 Ill. 2d 204, 217, 565 N.E.2d 950, 955 (1990); *People v. Spurlark*, 67 Ill. App. 3d 186, 196, 384 N.E.2d 767, 774 (1978).

A criminal defendant has no right to select an attorney who has a conflict of interest or counsel who is not a member of the bar. *Wheat*, 486 U.S. at 159, 100 L. Ed. 2d at 149, 108 S. Ct. at 1697. Similarly, a defendant has no right to counsel he cannot afford, nor may he insist upon being represented by an attorney who declines to represent him. *Wheat*, 486 U.S. at 159, 100 L. Ed. 2d at 149, 108 S. Ct. at 1697; see also *People v. Young*, 207 Ill. App. 3d 130, 134, 565 N.E.2d 309, 311 (1990) (criminal defendant has no right to insist upon counsel who does not "stand ready, willing and able" to appear before the court). A defendant who abuses the sixth amendment in an attempt to delay trial and the effective administration of justice may forfeit his right to counsel of choice. *People v. Childress*, 276 Ill. App. 3d 402, 413, 657 N.E.2d 1180, 1188 (1995) (defendant will lose right to counsel of choice when he attempts to "thwart justice, delay, or embarrass the effective administration of justice"); see also *People v. Antoine,* 335 Ill. App. 3d 562, 580, 781 N.E.2d 444, 460 (2002) ("[t]he exercise of the right to choice of counsel may be denied if it will unduly interfere with the administration of justice").

Most importantly for purposes of this appeal, these limitations do not exist solely to ensure a defendant is guaranteed an effective advocate; instead, they also satisfy a court's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160, 100 L. Ed. 2d at 149, 108 S. Ct. at 1698; see also *Gonzalez-Lopez*, 548 U.S. at ___, 165

L. Ed. 2d at 421-22, 126 S. Ct. at 2566. Accordingly, it is not only a criminal defendant's sixth amendment right at stake when a court considers the accused's insistence on the counsel of his choosing, but also the tribunal's "institutional interest in the rendition of just verdicts" and the administration of fair trials. *Wheat*, 486 U.S. at 160, 100 L. Ed. 2d at 149, 108 S. Ct. at 1698. Indeed, the Supreme Court has mandated that a trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness." *Gonzalez-Lopez*, 548 U.S. at ___, 165 L. Ed. 2d at 421, 126 S. Ct. at 2565-66; see also 134 Ill. 2d R. 13(c)(3) (requiring trial court to evaluate equitable concerns when considering counsel's motion to withdraw).

If, however, a trial court either abuses its discretion or otherwise erroneously deprives a defendant of his right to counsel of choice, the deprivation is "complete" and is not subject to harmless error analysis, regardless of whether the defendant ultimately received a fair trial. *Gonzalez-Lopez*, 548 U.S. at ___, 165 L. Ed. 2d at 418-19, 126 S. Ct. at 2563. "It is true enough that the purpose of the rights set forth in [the sixth amendment] is to ensure a fair trial; but it does not follow that the rights can be disregarded so long as the trial is, on the whole, fair." *Gonzalez-Lopez*, 548 U.S. at ___, 165 L. Ed. 2d at 417, 126 S. Ct. at 2562; see also *Gonzalez-Lopez*, 548 U.S. at ___ n.3, 165 L. Ed. 2d at 419 n.3, 126 S. Ct. at 2563 n.3 (whether counsel of choice was properly denied in order to ensure fair trial is analytically distinct from whether defendant received fair trial after counsel of choice was improperly denied).

Before addressing the merits of defendant's claim, we must first determine whether, as the State alleges, he has forfeited his right to appeal this issue. Issues concerning alleged trial court error are properly preserved for appellate review only when a defendant objects at trial and also

includes the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988). Defendant admits that his posttrial motion failed to raise this issue; however, he insists that the plain error doctrine requires this court to reach the merits of his claim because the denial of the counsel of his choice affected a fundamental right.

Under the plain error doctrine, this court will review a forfeited issue when either (1) the evidence presented at trial was so closely balanced that the alleged error may have improperly tipped the scales of justice; or (2) the error was "so serious that it affected the fairness" of the defendant's trial or challenged "the integrity and reputation of the judicial process." *People v. Allen*, 222 Ill. 2d 340, 352-53, 856 N.E.2d 349, 355-56 (2006). The plain error doctrine, however, does not preserve all errors for review whether or not they were raised in the trial court. *Allen*, 222 Ill. 2d at 353, 856 N.E.2d at 356; see also *People v. Herron*, 215 Ill. 2d 167, 177, 830 N.E.2d 467, 474 (2005). Even errors affecting constitutional rights may be forfeited provided they do not affect the fairness of a defendant's trial or the integrity of the judicial process. *Allen*, 222 Ill. 2d at 352-53, 856 N.E.2d at 355-56. The reviewing court has discretion to determine whether it will entertain an appeal of an alleged error affecting substantial rights that was not properly preserved. *Allen*, 222 Ill. 2d at 351, 856 N.E.2d at 355; see also 134 Ill. 2d R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court").

We determine that a plain error review of defendant's sixth amendment claim is appropriate, although not for the reasons given by defendant. We agree with both defendant and the State that the first prong of the plain error doctrine is not relevant to our analysis. The trial

court had no occasion to determine whether the evidence ultimately presented at trial was closely balanced when Hough filed his pretrial motion. Furthermore, the decision to permit Hough to withdraw did not affect the balance of the evidence presented at trial.

Before we consider the second prong of the plain error doctrine, however, *Allen* informs us that, contrary to defendant's assertion, we are not required to review any alleged trial court error affecting fundamental rights that was not properly preserved for appeal. *Allen*, 222 Ill. 2d at 351, 856 N.E.2d at 355. Instead, before exercising our discretion to review the issue, we evaluate whether the alleged error potentially affected either the fairness of defendant's trial or calls into question the integrity of the judicial process. *Allen*, 222 Ill. 2d at 352-53, 856 N.E.2d at 355-56.

Defendant nowhere contends that his trial was unfair, and our careful review of the record reveals no evidence to support such a contention. However, defendant's challenge to the trial court's decision to permit Hough to withdraw does not lend itself to an evaluation of whether he ultimately received a fair trial. As the United States Supreme Court held in *Gonzalez-Lopez*, if the trial court indeed erred in denying defendant his counsel of choice, whether defendant ultimately received a fair trial is of no consequence. *Gonzalez-Lopez*, 548 U.S. at ___, 165 L. Ed. 2d at 422, 126 S. Ct. at 2566 (denial of counsel of choice not subject to harmless error analysis). Thus, the "fair trial" standard, which is a close relation to the harmless error standard of review, is not an appropriate means to assess whether defendant's appeal warrants the exercise of our discretion.

Nevertheless, defendant has presented an alleged pretrial defect that affects a substantial right, which we do have discretion to hear on appeal. See 134 Ill. 2d R. 615(a). Whether the trial

court was wrong to deny defendant his constitutional right to the counsel of choice raises legitimate concerns about the integrity of the judicial process and ensuring that the "legal proceedings appear fair to all who observe them." Compare *Allen*, 222 Ill. 2d at 352-53, 856 N.E.2d at 355-56, with *Wheat*, 486 U.S. at 160, 100 L. Ed. 2d at 149, 108 S. Ct. at 1698. Furthermore, whether a trial court has abused its discretion by permitting an attorney to withdraw over a defendant's objection in a criminal trial under these unique circumstances is one of first impression for this court. Accordingly, we exercise our discretion and proceed to the merits of defendant's case applying an abuse of discretion standard of review. See *People v. Burrell*, 228 Ill. App. 3d 133, 142-43, 592 N.E.2d 453, 460 (1992).

Defendant's principal contention is that because Hough's motion to withdraw was dilatory, the trial court abused its discretion by granting it. Specifically, he reasons that if he had requested new counsel at the same point in pretrial proceedings, the trial court almost certainly would have denied it as an improper delay tactic. Defendant thus asserts that the court likewise should have rejected Hough's motion as unduly dilatory.

Defendant reasons by analogy that because this court has rejected attempts by criminal defendants to delay their trials by substituting new counsel at the last minute, the trial court abused its discretion in permitting an attorney's withdrawal on the eve of trial that resulted in an eight-month trial delay. See, *e.g.*, *People v. Jackson*, 216 Ill. App. 3d 1, 7, 574 N.E.2d 719, 723 (1991) (trial court does not abuse discretion in denying defendant's request for continuance to obtain new counsel when request made solely for dilatory reasons); see also *Antoine*, 335 Ill. App. 3d at 580-81, 781 N.E.2d at 460-61 (trial court did not abuse discretion in denying defendant's

request for continuance to be represented by substitute counsel when continuance would have delayed sentencing and defendant could not prove he had retained attorney ready, willing and able to represent him).

Defendant also contends that his right to be represented by Hough had attached, *i.e.*, that he had a sixth amendment right to insist upon his representation after he accepted the case and became counsel of record. See *Maine v. Moulton*, 474 U.S. 159, 170, 88 L. Ed. 2d 481, 492, 106 S. Ct. 477, 484 (1985) ("Once the right to counsel has attached and been asserted, the State must of course honor it"). Accordingly, defendant argues that Hough could no longer decline to represent him.

Finally, defendant argues that because Hough's stated reason for withdrawing — that he was unable to communicate with defendant's mother — did not fall within any of the mandatory or permissive grounds for attorney withdrawal as set out in the Illinois Rules of Professional Conduct, Hough's motion was pretextual, conclusory and unsupported by law. Defendant contends, therefore, that the trial court abused its discretion in granting the motion to withdraw.

The State responds that, as shown by the record, Hough had good cause to withdraw, specifically, that the lack of communication with defendant's mother made it unreasonably difficult for Hough to prepare an effective defense. Citing Rule 1.16(b)(1)(D) of the Illinois Rules of Professional Conduct (134 Ill. 2d R. 1.16(b)(1)(D)), which permits an attorney to withdraw from a case when a client's conduct "renders it unreasonably difficult for the lawyer to carry out the employment effectively," the State argues, essentially, that the conduct of defendant's mother was a proxy for the conduct of defendant. Because Hough could not reach defendant's mother,

24

1-05-1849

the State argues, she made it unreasonably difficult for Hough to present an effective defense, creating legitimate grounds for withdrawal.

Initially, we note our agreement with defendant that his sixth amendment right to be represented by Hough as his counsel of choice had attached when the attorney filed his motion to withdraw. Hough had accepted defendant's case and represented defendant in a suppression hearing. Hough was defendant's counsel of record and therefore was not free to decline to represent him without the trial court's permission. See, *e.g.*, *People v. Segoviano*, 189 Ill. 2d 228, 245, 725 N.E.2d 1275, 1283 (2000) (upholding trial court's denial of defense counsel's pretrial motion to withdraw in criminal case).

Whether the trial court abused its discretion in permitting Hough to withdraw is another question entirely, however, and we disagree completely with the remainder of the arguments put forth by both defendant and the State. Contrary to the State's assertion, the conduct of defendant's mother is not a proxy for defendant's conduct and does not fall within the ambit of Rule 1.16(b)(1)(D). Indeed, beyond cursory *ipse dixit* statements, the State fails to provide support for its assertion that defendant's mother was necessary to the effective representation of defendant. The facts of this case do not remotely implicate defendant's mother, and we fail to see how her cooperation is in any way relevant to defendant's case.[1]

---

[1]Although the State does not argue the point, the record suggests that the cooperation of defendant's mother was required for another reason of considerable interest to Hough, namely, payment of his legal fees. The record reflects defendant was initially appointed a public defender

25

1-05-1849

Furthermore, although Rule 1.16 is certainly binding on Hough, it is not binding authority on the trial court. See, *e.g.*, *Norton Frickey, P.C. v. James B. Turner, P.C.*, 94 P.3d 1266, 1270 (Colo. App. 2004) (noting that the Colorado Rules of Professional Conduct "provide guidance in the attorney-client relationship and serve as a mechanism of internal professional discipline" but are not binding on the courts and lack the force of law). Therefore, while the Rules of Professional Conduct certainly may inform a trial court's decision to permit an attorney to withdraw, the court must have independent binding authority for its decision.

We are similarly unpersuaded by defendant's contention that the trial court should have denied Hough's motion as dilatory. The rule governing whether a trial court abuses its discretion

_____

because he was unable to afford an attorney and that Hough was later retained with the assistance of defendant's mother. The record also shows that when Hough first requested leave to withdraw, defendant alleged that Hough was owed only "a little bit more" money. Defendant's inability to pay his legal fees may have constituted legitimate grounds for allowing Hough to withdraw under *Wheat*, which provides a defendant "may not insist on representation by an attorney he cannot afford." *Wheat*, 486 U.S. at 159, 100 L. Ed. 2d at 149, 108 S. Ct. at 1697. Similarly, Rule 1.16(b)(1)(F) allows withdrawal when a client "substantially fails to fulfill an agreement or obligation to the lawyer as to expenses or fees." 134 Ill. 2d R. 1.16(b)(1)(F). Because neither party raises the issue and because the details of the financial arrangement between defendant and Hough are not before us, we do not reach the merits of whether nonpayment of fees would have provided an independent ground for the trial court's grant of Hough's motion to withdraw

26

by denying a defendant's request for substitute counsel provides simply that a court may deny such a request when it believes the defendant is abusing his sixth amendment right to delay the efficient administration of justice. See *Young*, 207 Ill. App. 3d at 134, 565 N.E.2d at 311 (whether defendant's selection of counsel of choice unreasonably interferes with orderly process of judicial administration lies with sound discretion of trial court); *Burrell*, 228 Ill. App. 3d at 142, 592 N.E.2d at 459 (factors relevant to whether request for new counsel is improper delay tactic are "whether the defendant has been continuously in custody, whether he has informed the trial court of efforts to obtain counsel, and whether he has cooperated with appointed counsel even though dissatisfied with that counsel").

Defendant's assertion that the trial court certainly would have denied a similar request for new counsel, had defendant made one because it would impermissibly delay the trial is pure speculation. *Cf. People v. Bowman*, 138 Ill. 2d 131, 146, 561 N.E.2d 633, 641 (1990) (rejecting as mere conjecture defendant's argument that he was prejudiced by attorney's failure to file written motion to withdraw). The record does not support the inference that Hough used the motion to withdraw as a delay tactic.

Although we are troubled that defendant's trial was delayed eight months, we note that the delay originated because the State was not prepared to go to trial on the day Hough stated his desire to withdraw. The record reveals no basis to conclude that the trial court knew or could have known that such a delay would result from setting a date to consider Hough's motion and ultimately permitting him to withdraw. Indeed, the majority of the seven-month delay that followed the withdrawal hearing resulted from discovery continuances. Regardless, we decline to

announce a rule that a trial court has no discretion to allow an attorney to withdraw when the withdrawal may potentially cause substantial delay. Delay is only one factor that a trial court must consider when presented with a motion to withdraw. See 134 Ill. 2d R. 13(c)(3) (requiring court to consider both potential delay and concerns of equity).

Instead, we ground our holding in the principles set forth by the Supreme Court in *Wheat* and in the requirements of Rule 13(c)(3), which governs withdrawal motions. In *Wheat*, the Supreme Court considered whether the trial court abused its discretion when it refused to allow a criminal defendant to be represented by trial counsel with a conflict of interest. The defendant in *Wheat* was charged with participating in a drug distribution conspiracy involving multiple codefendants. *Wheat*, 486 U.S. at 154, 100 L. Ed. 2d at 145, 108 S. Ct. at 1694. Two days before trial, the defendant moved to have the attorney representing his two codefendants appointed as his trial counsel. *Wheat*, 486 U.S. at 155, 100 L. Ed. 2d at 146, 108 S. Ct. at 1695. All parties agreed to waive the right to representation by conflict-free counsel. *Wheat*, 486 U.S. at 157, 100 L. Ed. 2d at 147, 108 S. Ct. at 1696.

The government objected, claiming that because the codefendants likely would be asked to testify against each other, the conflict was so serious and irreconcilable that it would prevent the substituted attorney from effectively representing any of the defendants. *Wheat*, 486 U.S. at 155-56, 100 L. Ed. 2d at 146-47, 108 S. Ct. at 1695. Agreeing with the government, the trial court denied the defendant's motion for substitute counsel. *Wheat*, 486 U.S. at 157, 100 L. Ed. 2d at 147, 108 S. Ct. at 1696.

Affirming that decision, the United States Supreme Court held that trial courts have an

1-05-1849

affirmative obligation to ensure criminal defendants receive a fair trial — one that appears fair to all objective observers — and that this obligation occasionally requires a court to deny a criminal defendant his counsel of choice. *Wheat*, 486 U.S. at 160, 100 L. Ed. 2d at 149, 108 S. Ct. at 1698. The Court noted that the criminal defendant's insistence on counsel with a conflict of interest put the trial court in the position of being " 'whip-sawed' by assertions of error," with allegations of the deprivation of sixth amendment rights on the one hand and ineffective assistance claims on the other. *Wheat*, 486 U.S. at 161, 100 L. Ed. 2d at 150, 108 S. Ct. at 1698. See also *Segoviano*, 189 Ill. 2d at 245, 725 N.E.2d at 1283 (criminal defendant alleged both ineffective assistance and trial court error when court refused attorney's request to withdraw); *Bowman*, 138 Ill. 2d at 148, 561 N.E.2d at 641 (rejecting the notion that defendant may be placed in "no-lose" situation where he may allege viable error no matter how trial court exercises its discretion).

Faced with these competing and irreconcilable concerns, the Supreme Court held in *Wheat* that a trial court must have broad discretion to rely on its experience and judgment to arrive at a decision that maintains the court's integrity and ensures that the proceedings are fair. *Wheat*, 486 U.S. at 162, 100 L. Ed. 2d at 151, 108 S. Ct. at 1699. Accordingly, the Supreme Court held there was no "right" or "wrong" answer and, although other courts could reach differing conclusions with equal justification when presented with similar circumstances, the denial of the defendant's counsel of choice was not an abuse of discretion when the fairness of the proceedings might be called into question. *Wheat*, 486 U.S. at 164, 100 L. Ed. 2d at 152, 108 S. Ct. at 1700. Recently, the Supreme Court affirmed this broad discretion of trial courts on this issue in *Gonzales-Lopez*, noting a court has "wide latitude in balancing the right to counsel of choice

29

against the needs of fairness." *Gonzalez-Lopez*, 548 U.S. at ___, 165 L. Ed. 2d at 421, 126 S. Ct. at 2565-66.

Applying the principles set forth in *Wheat* and *Gonzalez-Lopez* to this case, we hold that the trial court did not abuse its broad discretion in limiting defendant's right to be represented by Hough. The record reflects that Hough expressed a strong desire to be released from his obligation to represent defendant. Whatever his underlying reasons for doing so, Hough's insistence on withdrawal raised legitimate concerns about his inclination and ability to effectively represent defendant. Similarly, defendant's statement at the withdrawal hearing that he was "ready to get it over with" created additional cause for concern. Faced with a recalcitrant attorney and a seemingly indifferent defendant, the trial court rationally could conclude that the integrity and fairness of the defendant's trial were at stake. Accordingly, the trial court properly exercised its discretion to appoint new counsel who would preserve the integrity of the judicial process and ensure that the proceedings "appear[ed] fair to all who observe[d] them." *Wheat*, 486 U.S. at 160, 100 L. Ed. 2d at 149, 108 S. Ct. at 1698. See also *United States v. Hughey*, 147 F.3d 423, 430-31 (5th Cir. 1998) (upholding discretion of district court to permit attorney to withdraw due to scheduling conflicts, despite defendant's objection, because of concerns about integrity of judicial process and efficient administration of justice).

Finally, we note that the principles we have applied from *Wheat* are consistent with Supreme Court Rule 13(c)(3), which provides that in considering a motion to withdraw, a trial court will weigh whether the granting of the motion "would delay the trial of the case, *or would otherwise be inequitable*." (Emphasis added.) 134 Ill. 2d R. 13(c)(3). Thus, although the

potential for delay is of considerable concern, the court must balance that against the fundamental concerns of equity, fairness and justice, which the Supreme Court stated could be sufficient to deny a defendant his counsel of choice. *Wheat*, 486 U.S. at 162, 100 L. Ed. 2d at 150-51, 108 S. Ct. at 1699.

In sum, the trial court in this case, confronted by a proverbial "whip-saw" of error, did not abuse its discretion in permitting Hough to withdraw from his representation of defendant. Instead, the court made an informed judgment based on its experience, instincts and sound judgment, which is in keeping with both the standard set out in *Wheat* and the spirit of our own Supreme Court rule. See *Wheat*, 486 U.S. at 163, 100 L. Ed. 2d at 151, 108 S. Ct. at 1699; 134 Ill. 2d R. 13(c)(3). Though defendant, in his reply brief, insists he had the unequivocal sixth amendment right to "make even a foolish choice to continue with" Hough's representation, defendant lacked the ability to waive the trial court's obligation to provide him with a fair trial, including representation by effective counsel, and defendant likewise could not insist upon representation that would compromise the integrity of the proceedings.

We close with a note on the scope of the trial court's discretion. As the Supreme Court observed in *Wheat*, no "right" or "wrong" answers exist in a case such as this, which turns on the substantial latitude of the trial court to make an informed judgment. *Wheat*, 486 U.S. at 163, 100 L. Ed. 2d at 151, 108 S. Ct. at 1699. Here, the trial court very easily could have determined that Hough could effectively represent defendant despite the attorney's misgivings about doing so and his eagerness to withdraw. *Cf. Segoviano*, 189 Ill. 2d at 245, 725 N.E.2d at 1283. Without the benefit of hindsight and in the context of the murky "pre-trial context when relationships between

31

parties are seen through a glass, darkly" (*Wheat*, 486 U.S. at 162, 100 L. Ed. 2d at 151, 108 S. Ct. at 1699), the trial court made the most equitable decision possible. Ultimately, the trial court was in the best position to determine whether Hough should have been required to continue representing defendant in light of the many competing concerns we have outlined. The evaluation of the facts and circumstances relevant to the exercise of discretion in this matter should properly be left "to the informed judgment of the trial court." *Wheat*, 486 U.S. at 164, 100 L. Ed. 2d at 152, 108 S. Ct. at 1700.

CONCLUSION

In summary, the evidence presented by the State was sufficient to prove defendant's guilt beyond a reasonable doubt. Moreover, the trial court did not abuse its discretion in granting defense counsel's motion to withdraw before trial.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

O'BRIEN, P.J., and O'MARA FROSSARD, J., concur.