2023 IL App (1st) 220569-U

FOURTH DIVISION
December 14, 2023

No. 1-22-0569

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16 CR 12294 |
| BRANDON COLLINS, | ) ) ) | Honorable Michael R. Clancy, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

_____

JUSTICE OCASIO III delivered the judgment of the court.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's speedy-trial rights were not violated, the circuit court did not abuse its discretion when it denied the motion for a continuance, and the evidence was sufficient to convict him of first degree murder and aggravated battery with a firearm.

¶ 2    Following a jury trial, defendant Brandon Collins was found guilty of first degree murder and two counts of aggravated battery with a firearm. Collins was sentenced to an aggregate 65 years in prison: 45 years for first degree murder and 10 years for each count of aggravated battery

with a firearm, the sentences to be served consecutively. On appeal, Collins argues his right to a speedy trial was violated, he was denied the right to a fair trial, and the State failed to prove him guilty beyond a reasonable doubt. For the following reasons, we affirm.

¶ 3                                        BACKGROUND

¶ 4      Collins was arrested on July 14, 2016, and demanded trial. Collins was indicted with four counts of first degree murder, eight counts of attempted first degree murder, and two counts of aggravated battery with a firearm. On August 23, 2016, Collins was arraigned. The parties agreed to continue the case during several court dates from August 23, 2016 to February 25, 2020. Collins's trial was set for February 24, 2020; however, one of the State's key witnesses, Karazeta Hendrix, became ill and was hospitalized. The parties agreed to a new trial date of March 30, 2020.

¶ 5      On March 17, 2020, the supreme court issued an emergency order directing courts to continue trials for the next 60 days and, until further order of the court, suspending the time provisions of the Speedy Trial Act (725 ILCS 5/103-5(b) (West 2020)) (the Act). Ill. S. Ct., M.R. 30370 (eff. Mar. 17, 2020). The toll on the Act was not lifted until October 1, 2021. Ill. S. Ct., M.R. 30370 (June 30, 2021).

¶ 6      On March 20, 2020, the case was continued by order of court due to COVID-19 to August 25, 2020. Collins again demanded trial on August 25, 2020, and again on January 8, 2021. On August 31, 2021, Collins filed a motion to dismiss his case due to a violation of the Act, and the case was set for trial on October 18, 2021. On October 18, 2021, the circuit court denied Collins's motion, stating that the supreme court had tolled the demand for trial due to the pandemic and that the State was within the 120-day period.

¶ 7      Jury selection began the same day. Following jury selection, the State provided defense counsel with supplemental discovery, which contained additional statements made by Hendrix

during trial preparation. On October 19, 2021, defense counsel made an oral motion for a continuance. Defense counsel stated she received the supplemental discovery around 8:30 p.m. on October 18, 2021, and the discovery was "two typed pages long" and contained "21 bullet points." The supplemental discovery revealed that Hendrix had stated "she felt her video statement was not complete" and "after she spoke with detectives and ASA Barb Bailey, her memories of the night started to come back to her more clearly." Defense counsel requested a continuance to further investigate these statements and to hire an identification expert "because it's clear from that science that memory doesn't get better over time, it gets worse."

¶ 8     The State explained Hendrix resided in Georgia and the State did not have an opportunity to "fully interview her." Additionally, Hendrix had flown to Chicago for the previous trial date, but she got an infection and was in the hospital. This time, Hendrix drove to Chicago for the trial because she had an oxygen tank and was unable to fly. Hendrix arrived on Sunday, and the State spoke with her on Monday. The State indicated that the supplemental discovery was "voluminous" and "there [were] changes within what [Hendrix] had previously told the detectives and told a state's attorney in the electronically recorded interview." The State objected to the continuance.

¶ 9     The circuit court denied the motion for a continuance stating both sides had an ongoing duty to update each other regarding additional discovery and that Hendrix could be impeached. The circuit court also noted Collins had demanded trial and answered ready. The circuit court allowed defense counsel to have additional time to prepare for cross examination.

¶ 10    At trial, Shenquella Moore testified that she was married to Mecahel Holder, and she was aware her husband was dating Hendrix. On July 4, 2016, Moore attended the party at the 1100 block of Ridgeway with Holder and Hendrix. Moore testified Hendrix drove the three of them to the party and they arrived around 11:00 p.m. There were about 30 to 50 people at the party and

Collins was the only person Moore knew. She had seen him "about three or four" times before the party as he was "an associate" of Holder's.

¶ 11    Moore testified that, on the night of the party, she did not drink, nor did she have any drugs or narcotics. Moore further testified Holder had been drinking and was under the influence of alcohol. When Holder drank, he would act aggressively. When they arrived at the party, Holder got out of the car and walked up to Collins. Moore and Hendrix remained in the car. Moore observed Collins and Holder walk away to talk. Collins was "explaining a situation" to Holder about another young man at the party. Prior to their arrival, Collins had an issue with this young man and Collins told Holder "I got it, don't worry about it, I got it, I could talk to him myself." Shortly thereafter, Holder had an issue with the young man that Collins had previously told him to leave alone.

¶ 12    At some point, Moore, Hendrix, and Holder left so Holder could buy more alcohol. When the three returned to the party, Holder got out of the car to talk to Collins. Moore got out of the car to stretch her legs. Holder left the group and went to talk to another person at the party. When Holder returned, Moore heard Collins tell him to calm down and people were "trying to party and kick it." Collins told Holder he "should respect his wife." Collins also told Moore she needed to calm her husband down because "all these guys and girls out here all got guns." Moore used Hendrix's phone to take a photo of Collins and Holder. In the picture, Collins was holding a gun. Moore testified when she took the photo, she did not notice Collins had a gun. Before Moore took the photo, Collins and Holder "had words" about a cup of alcohol.

¶ 13    After taking the photo, Holder walked across the street and began talking to a dark-skinned man wearing a white shirt and black hat. Moore was in the car, and she was able to see Holder in the passenger's side mirror. Moore heard gunshots and when she looked to where Holder was

standing, she saw Collins and other men standing around Holder, who was on the ground, and shooting at him.

¶ 14    Moore testified she saw Collins and the other men running past the car. Collins pointed his gun at Moore, and he looked at her and stated, "Kill them hoes, too." Collins was standing in front of the car and began shooting at her. There were two other men standing on the side of car who were also shooting at the car. Moore testified Hendrix was in the car and she had her head down and was looking at her phone. Moore told Hendrix "They just shot me." When the men began shooting at the car, Moore ducked to protect and cover herself and she was shot in her right wrist. Moore heard Hendrix "pleading for her life from the defendant." Moore heard Hendrix say "Please don't kill me. It's my birthday." Hendrix eventually was able to drive away. Moore testified as they were driving away, she was still able to hear gunshots. Shortly after driving away, Hendrix hit a tree.

¶ 15    When police arrived, Moore told them Collins shot at her and Hendrix and he killed her husband. Moore was taken to the hospital to be treated for her injuries. On July 5, 2016, while Moore was in the hospital, she talked to detectives and told them she saw and observed. On July 7, 2016, Moore observed a photo array, and she identified Collins and told detectives Collins was the person who shot her and her husband. On July 12, 2016, Moore provided a statement to a detective and an assistant state's attorney, which was recorded. In this statement, Moore identified Collins as the shooter. Moore also testified before the grand jury, where she again identified Collins as the person who shot her and her husband.

¶ 16    On August 23, 2016, Moore observed another photo array, and she did not recognize anyone. On November 16, 2017, Moore observed three more photo arrays. In the first photo array, Moore did not recognize anyone. In the second photo array, Moore was able to recognize and

identify two individuals: one was a man who spoke with her husband on July 4, 2016, and the other was one of the men who shot at her. In the third photo array, Moore identified one of the men that ran past the car.

¶ 17    Moore testified she met with the State approximately a week before the trial. Moore was shown the photo arrays. Moore testified she realized one of her identifications was "wrong." When the detective came to speak to her, Moore testified she was "halfway sleeping." Moore testified that the man she identified in the third photo array on November 16, 2017, as the man who ran past the car "looked similar to Brandon," which is why she identified him. Moore testified that her previous identifications of Collins were correct.

¶ 18    At the time of the trial, Moore had a pending case for contempt of court. Moore also had prior convictions: one from 2016 for misdemeanor forgery and another from 2006 for failing to report an accident involving death and attempted first degree murder.

¶ 19    Hendrix testified she met Holder on a dating site in February 2016, while living in Georgia. She moved to Chicago sometime between the end of May and beginning of June 2016. When Hendrix moved to Chicago, she spent her first three or four days living with Collins and his girlfriend, and she would see Collins every day. Hendrix met Moore about a week after she moved to Chicago.

¶ 20    On July 4, 2016, Hendrix, Moore, and Holder attended a party and then Hendrix drove them to the party on the 1100 block of North Ridgeway. Hendrix testified the night of the party she had not been drinking alcohol and she was not using drugs. Hendrix testified when they arrived at the party she and Moore sat in the car and talked, while Holder exited the car to "hang out" with his friend. Hendrix testified she saw Collins at the party. Hendrix estimated there were 50 to 100 people at the party and the only people she knew were Collins, Moore, and Holder.

¶ 21    At some point, Hendrix drove to a liquor store with Holder and Moore. Once they returned to the party, Hendrix parked her car parallel to the curb. Hendrix and Moore continued their conversation, and Holder had an "altercation" with Collins. She observed the two having a lot of "back and forth." Afterwards, Holder and Collins shook hands, "dabbed", and took a picture together. She thought they "squashed it."

¶ 22    Around midnight, Hendrix began receiving calls from her family wishing her a happy birthday. Later, some people, including Holder, Moore, and Collins, gathered by the passenger side window of her car and sang "Happy Birthday" to Hendrix.

¶ 23    Around 15 to 20 minutes later, Hendrix testified Moore jumped in her car and said, "they got [Holder] on the ground." Hendrix also heard someone yell "Georgia, pull off." Hendrix's car had Georgia license plates. Hendrix testified she saw a man she did not recognize standing in front of the car with a huge gun. She got out of the car and laid on the ground because she did not want to get shot. When Hendrix looked up, the man with the gun was standing over her. Hendrix begged for her life and stated, "please don't shoot me, it's my birthday." The man asked Hendrix "what the F was [she] doing there, and get the F out of there." Hendrix grabbed her car keys and drove away. Hendrix saw Collins standing on the passenger side of her car "pretty much on the sidewalk, firing at the car." Hendrix testified nothing was blocking her view and she knew Collins was shooting at her because she was looking directly at him. She did not hear Collins say anything. Hendrix testified when she looked Collins she thought "I know you, and you know me, like why are you doing this."

¶ 24    Hendrix testified Moore was balled up with half of her body on the passenger seat and the other half under the dashboard. As Hendrix drove away, she started feeling cramps in her stomach

and she could not feel her legs. She drove into a pole to stop the car. After the car stuck the pole, Moore left the car, but Hendrix stayed in the car as she could not move.

¶ 25    Hendrix was taken to Stroger Hospital, where she had surgery and was placed in a medically induced coma. On July 16, 2016, Detective Anthony Pulcanio came to speak to Hendrix and showed her a photo array. Hendrix identified Collins as the person who shot her and who was shooting at her car. Hendrix also spoke with Detective Jose Cardo at the hospital and told him Collins shot her. On July 18, 2016, Hendrix provided a videotaped statement. During the statement, Hendrix was shown another photo array, and she identified Collins as the person who shot her and shot at her car.

¶ 26    After Hendrix was released from Stroger Hospital, she moved back to Georgia. On March 30, 2017, Hendrix was visited by Lieutenant Reimers from the Clayton County Police Department. Lieutenant Reimers showed Hendrix several photo arrays, and Hendrix did not recognize anyone. Additionally, on November 14, 2018, Hendrix was visited again by Lieutenant Reimers, and he showed her photo arrays. Hendrix recognized one of the individuals as one of the people who sang "Happy Birthday" to her on July 4, 2016.

¶ 27    On September 13, 2018, Hendrix had surgery to have the bullet removed from her body. The bullet was sent to Chicago for testing.

¶ 28    On cross-examination, Hendrix testified that prior to trial she met with the State and told them she arrived at the party with Holder and that Moore was already at the party when they arrived. Moore had been with them earlier in the day but left at some point. Hendrix testified she had not mentioned this prior but when she was shown her taped statement, which she did not remember, she "spoke up about it."

¶ 29    Hendrix further testified she was shown the photo array from November 14, 2018, and she told the State she thought that the person she previously identified as someone who sang to her the night of July 4, 2016, might have been someone who helped on the night of the incident after she crashed her car.

¶ 30    Officer Francisco Iza testified he was on duty on July 5, 2016. Shortly after 1:30 a.m., he and his partner were driving westbound on Division Street. Officer Iza observed a car crashed into a tree. The car had bullet holes. Officer Iza encountered Moore, and during their conversation she said, "My husband was shot by Brandon." Moore also told Officer Iza that "[h]er husband met up with Brandon, and they got into an argument. And, at that point, Brandon went inside a home with two other individuals," and "they came out, all with handguns." After they came out of the house, they began shooting at Holder. Moore also stated she was shot at while trying to leave the scene.

¶ 31    Detective Cardo testified he was assigned to investigate the murder of Holder. Detective Cardo testified on July 5, 2016, he spoke with Moore while she was at the hospital. During their conservation, Moore gave Detective Cardo "the name Brandon." Moore also told Detective Cardo she had taken a photo on Hendrix's phone. Detective Cardo was given access to Hendrix's phone and the timestamp for the photo was 1:02 a.m. on July 5, 2016. Detective Cardo tried to interview Hendrix; however, she was intubated and sedated.

¶ 32    Detective Cardo testified he created the photo arrays that were eventually shown to Moore and Hendrix. The photos arrays contained six people, one was the person of interest, and the other five people were "fillers." Detective Cardo learned that Moore identified Collins in the photo array that was shown to her July 7, 2016. On the photo arrays shown to Hendrix on November 16, 2017, two of the people she identified were "fillers."

¶ 33    On July 16, 2016, Detective Cardo spoke with Hendrix. During their initial conversation, Hendrix did not tell Detective Cardo that Collins shot her. After Hendrix was shown a photo array, where she identified Collins as the person who shot her, Detective Cardo went to speak with Hendrix again. Hendrix "had tears in her eyes and she was visibly upset." Hendrix told Detective Cardo she identified Collins because "he had pointed a gun at her and shot at her." Hendrix stated, "when she looked at the photo, all the emotion came rushing back to her and she remembered."

¶ 34    The additional photo arrays shown to Moore in November 2017 and Hendrix in March 2017 were created after police recovered firearms that matched the ballistic evidence. Detective Cardo looked through police reports relating to the recovered firearms in order to find people of interest. These photo arrays contained persons of interest based on the ballistic information alerts. Collins was not the person of interest included on those photo arrays.

¶ 35    Forensic Investigator Paul Presnell observed Holder's body lying in the street. He also observed different cartridge cases. Presnell recovered fired cartridge cases from a .357 caliber gun, a .9-millimeter gun, and a .40 caliber gun. Bullets were also inventoried. Presnell also observed the scene of Hendrix's crashed car. From there, he was able to recover additional bullets from inside the car and on the street.

¶ 36    In his case in chief, Collins called Detective Ed Heerdt as a witness. Detective Heerdt testified at approximately 2:30 a.m. on July 5, 2016, he interviewed Hendrix, while she was in the emergency room being treated. Detective Heerdt was able to have a brief conversation with Hendrix and he was not able to ask follow-up questions or specifics. Hendrix told him she was in the car with Moore and Holder was standing outside of the car. Hendrix also told him she heard gunshots mixed with fireworks. She also said she did not see the shooter or a gun. Hendrix told Detective Heerdt that she thought she was shot as she drove off and she crashed into a tree.

¶ 37    The parties stipulated that Dr. Eimad Zakariya, an assistant medical examiner, would testify that Holder suffered nine gunshot wounds to his head, chest, and right upper thigh. Nine projectiles were recovered from Holder's body. The directionality of the projectiles could not be determined. The cause of cause of death was multiple gunshot wounds.

¶ 38    The jury found Collins guilty of first degree murder and two counts of aggravated battery with a firearm. Collins was sentenced to an aggregate term of 65 years.

¶ 39    This appeal followed.

¶ 40                                    ANALYSIS

¶ 41    Collins challenges his convictions on three grounds: (1) he was denied his right to a speedy trial, (2) the circuit court abused its discretion when it denied his motion for a continuance, and (3) the State failed to prove him guilty beyond a reasonable doubt of first degree murder and aggravated battery with a firearm because the eyewitness testimony was conflicting and not credible.

¶ 42                                    I. Speedy Trial

¶ 43    A criminal defendant has the constitutional right to a speedy trial. U.S. Const., amends. VI, XIV; Ill. Const., 1070, Art. I § 8. Additionally, in Illinois, if an incarcerated defendant is not tried within 120 days (excluding delays attributable to the defense), the defendant must be discharged from custody and the charges dismissed. 725 ILCS 5/103-5(a), 103-5(d) (West 2020).

¶ 44    In *People v. Mayfield*, 2023 IL 128092, the supreme court held that its emergency orders tolling the Act's time restrictions did not (1) exceed its administrative and supervisory authority to regulate court procedures or (2) violate the separation of powers. *Mayfield*, 2023 IL 128092, ¶¶ 3, 27-38. Therefore, any pretrial delay due to the COVID-19 orders did not violate the Act. *Id.* ¶ 41.

¶ 45    Defendant acknowledged in his reply brief that this issue is foreclosed by *Mayfield*. As *Mayfield* controls this issue, there was no speedy-trial violation in this case as the pretrial delays were a result of the supreme court's tolling of the Act.

¶ 46                                    II. Motion for a Continuance

¶ 47    The second issue that Collins raises on appeal is that the circuit court abused its discretion when it denied his motion for a continuance. The State argues the court properly considered the relevant factors in denying the motion to continue, and that even if the circuit court abused its discretion, Collins was not prejudiced.

¶ 48    The decision to grant or deny a continuance is within the discretion of the trial court. *People v. Walker*, 232 Ill. 2d 113, 125 (2009). This decision will not be overturned unless it is a clear abuse of discretion. *Id.* "Whether there has been an abuse of discretion necessarily depends upon the facts and circumstances in each case and '[t]here is no mechanical test *** for determining the point at which the denial of a continuance in order to accelerate the judicial proceedings violates the substantive right of the accused to properly defend.' " *Id.* (quoting *People v. Lott*, 66 Ill. 2d 290, 297 (1977)). Courts may consider the movant's diligence; the defendant's right to a speedy, fair, and impartial trial; the interests of justice; the history of the case; the complexity of the matter; the seriousness of the charges; docket management; judicial economy; and inconvenience to the parties and witnesses. *Walker*, 232 Ill. 2d at 125-26.

¶ 49    Where it appears that the refusal of additional time in some manner embarrassed the accused in the preparation of his defense and thereby prejudiced his rights, this court will reverse a defendant's resulting conviction. *Walker*, 232 Ill. 2d at 125. This court cannot find an abuse of discretion in the trial court's denial of a continuance without the defendant having shown he was prejudiced by the court's denial. *People v. Fountain*, 2016 IL App (1st) 131474, ¶ 34.

¶ 50    Collins argues the circuit court failed to consider all of the relevant factors and failed to ask how long of a continuance defense counsel needed. Collins relies on *Walker* to support his contention that the circuit court abused its discretion by denying his motion for a continuance. In *Walker*, the defendant's attorney requested a continuance on the day of a bench trial as she was not ready to proceed due to miscalendaring the trial date and being at trial on other cases the previous two evenings. *Walker*, 232 Ill. 2d at 117-18. The trial court denied the motion without letting defense counsel further explain or asking any questions that would have aided it in making its determination. *Id.* at 127. The supreme court found "the record support[ed] the inescapable conclusion that the circuit court mechanically denied the continuance without engaging in the thoughtful consideration of the specific facts and circumstances presented in the matter." *Id.* at 126. Additionally, the supreme court held that that circuit court had "completely abdicated its responsibility to conduct an informed deliberation of defense counsel's motion." *Id.* at 129.

¶ 51    We cannot say the circuit court abused its discretion when it denied the motion for a continuance. This case is distinguishable from *Walker*. At the time defense counsel requested a continuance, the jury had already been selected. Prior to denying the motion, the circuit court listened to the arguments of the parties and allowed defense counsel to state the reasons she was requesting a continuance. In its oral ruling, the circuit court stated Hendrix could "obviously be impeached by everything that she failed to say at the time she was interviewed by the detectives *** some five-and-a-half years ago." The circuit court allowed defense counsel additional time to prepare for cross examination and stated, "The fact that she's revealing anything new that she did not reveal back in 2016, she can be thoroughly impeached by the fact that here in 2021 she now somehow remembers things better than she did back in July of 2016." The circuit court also noted that Collins had demanded trial and answered ready for trial.

¶ 52    Additionally, the case was initially set for trial in February 2020 but was rescheduled due to Hendrix being hospitalized and unable to testify. In advance of the October 2021 trial, Hendrix drove from Georgia to Chicago as she used an oxygen tank and was unable to fly. Defense counsel indicated she had previously traveled to Georgia to speak with Hendrix and Hendrix indicated she did not want to speak with her.

¶ 53    Moreover, Collins does not argue that he was prejudiced by the denial of the motion to continue. We find the circuit court did not abuse its discretion in denying the continuance.

¶ 54                        III. Sufficiency of the Evidence

¶ 55    Lastly, Collins argues that the prosecution failed to present sufficient evidence to sustain his convictions. Collins argues the State's case hinged on the credibility of Moore and Hendrix and that their credibility was undermined by their backgrounds and the fact that their accounts of the events significantly vary.

¶ 56    When determining the sufficiency of the evidence, the reviewing court must determine whether, after reviewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). The reviewing court does not retry the defendant and will not substitute its judgment for that of the trier of fact for issues involving credibility of witnesses and weight of the evidence. *Id.* at 281. A conviction will not be reversed unless the evidence is " 'unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt.' " *Id.* (quoting *People v. Campbell*, 146 Ill. 2d 363, 375 (1992)).

¶ 57    The State has to prove beyond a reasonable doubt the identity of person who committed the crime. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). "An identification will not be deemed sufficient to support a conviction if it is vague or doubtful." *Id.* "A single witness' identification

of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *Id.*

¶ 58    When evaluating identification testimony, the court should consider the factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972), which are: (1) the witness's opportunity to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the witness's level of certainty at the identification confrontation, and (5) the length of time between the crime and the identification confrontation. *Slim*, 127 Ill. 2d at 307-08.

¶ 59    Here, Collins argues his case is similar to *People v. Smith*, 185 Ill. 2d 532 (1999), and *People v. Herman*, 407 Ill. App. 3d 688 (2011). In *Smith*, the court reversed the defendant's murder conviction due to insufficient evidence. *Smith*, 185 Ill. 2d at 534. The State's case hinged on the testimony of one witness. *Id.* at 542. The witness, Debrah Caraway, testified the victim left the bar alone, while other witnesses testified the victim left with a group. *Id.* One witness also testified she was standing near the victim in the parking lot when he was shot. *Id.* The court found that the serious inconsistencies of Caraway's testimony and her repeated impeachment made it so no reasonable trier of fact could have found her testimony credible. *Id.* at 545.

¶ 60    In *Herman*, the defendant challenged the sufficiency of the evidence based on a lack of credible testimony. *Herman*, 407 Ill. App. 3d at 703. After a bench trial, the defendant was convicted of multiple charges including criminal assault, kidnapping, and misconduct. *Id.* One of the State's witnesses testified she was sexually assaulted by the defendant and was "a self-described crack cocaine addict." *Id.* at 689. The appellate court found the witness's testimony was "fraught with inconsistencies and contradictions, most notably related to the time line of events related to the encounter." *Id.* at 705. Notably, at trial, the witness's testimony differed from her

previous sworn statement. *Id.* at 706-07. The appellate court stated that "these inconsistencies are not minor, as the trial court found but, rather, seriously undermine [the witness's] testimony on material points and when taken together raise unresolved questions about the whole of her testimony." *Id.* at 707.

¶ 61 Collins argues Moore's pending case for contempt of court and prior convictions for forgery and failing to report an accident that involved death and attempt murder affect her credibility. Additionally, Collins argues the inconsistencies between Moore's testimony and Hendrix's testimony cast doubts on their credibility. Collins argues there were inconsistencies in their testimony about (1) whether Moore rode to the party with Hendrix and Holder, (2) whether Collins said, "Kill them hoes too," (3) Moore's location when Holder was shot, (4) Collins's location during the shooting of Moore and Hendrix, and (5) whether Hendrix pleaded with Collins or the man who was standing in front of the car.

¶ 62 Here, there are two witnesses who identified Collins as the perpetrator. Both Moore and Hendrix consistently identified Collins. Moore testified Collins was the only person she knew at the party, and she had seen him about three to four times before the party as he was "an associate" of Holder's. Moore testified when Holder was shot, she was able to see him in the passenger side mirror of the car and she saw Collins and other men shooting at him. Moore also testified Collins pointed a gun at her and said, "Kill them hoes, too."

¶ 63 After the car crash, Moore made an immediate identification. She told responding officers Collins was the person who shot at her and who killed Holder. A few days after the shooting, Moore observed a photo array and identified Collins. Additionally, in a recorded statement Moore identified Collins as the shooter. Moore again identified Collins as the shooter when she testified

before the grand jury. Moore's identification of Collins was corroborated by other witnesses at trial.

¶ 64    Hendrix testified prior to the party she knew Collins because she lived with him after she moved to Chicago. Hendrix also testified she saw Collins firing at the car, and she was looking directly at him as he shot at her. Hendrix identified Collins as the person who shot at her and her car when she was shown the first photo array and again when she spoke with Detective Cardo. Hendrix gave a taped statement, where she again identified Collins as the person who shot at her and her car.

¶ 65    Their identification of Collins as one of the shooters remained consistent. Additionally, both Moore and Hendrix testified that on July 4, 2016, they had not been under the influence of alcohol, nor had they consumed any drugs. The only conflict between the testimonies of Moore and Hendrix related to who arrived at the party together, the location of Moore during the shooting of Holder, and the location of Collins during the shooting of Moore and Hendrix. Moore testified she arrived at the party with Hendrix and Holder. Hendrix testified she drove to the party with Holder, and they met Moore there. Moore testified she was in the car when Holder was shot and Hendrix testified Moore "ran into [her] car, and she jumped in and she was like, they got [Holder] down on the ground." Moore testified that Collins was standing in front of the car, while Hendrix testified Collins was standing on the passenger side. Variations in testimony are "to be expected anytime several persons witness the same event under traumatic circumstances." *People v. Brooks*, 187 Ill. 2d 91, 133 (1999). "The trier of fact is free to resolve inconsistencies in testimony and is free to accept or reject as much or as little of a witness's testimony as it pleases." *People v. Sullivan*, 366 Ill. App. 3d 770, 782 (2006). These inconsistencies do not negate the fact that Collins was the person Hendrix and Moore identified as the shooter.

¶ 66 Additionally, Collins argues that Moore's identification of "fillers" and her prior history lessens her credibility. Testimony at trial showed there were multiple shooters. Photo arrays were created with persons of interest relating to firearms linked to the shootings on July 4, 2016. As previously noted, Moore testified the only person that she knew at the party, other than Hendrix and Holder, was Collins. With regards to Moore's criminal record, Moore testified to her history at trial. The jury was able to hear this testimony and consider it when making credibility determinations.

¶ 67 The jury was in the best position to observe the witnesses and assess their credibility. We must defer to their findings and not substitute our judgment for the jury's. For the foregoing reasons, we find the identification of Collins by Moore and Hendrix was sufficient for the jury to find Collins guilty beyond a reasonable doubt.

¶ 68                                        CONCLUSION

¶ 69 Based on the foregoing reasons, we affirm.

¶ 70 Affirmed.